In the Matter of the SOCIETY FOR ETHICAL CULTURE IN THE CITY OF NEW YORK, Respondent, v BEVERLY M. SPATT et al., Constituting the Landmarks Preservation Commission, et al., Appellants.

First Department, May 3, 1979

## APPEARANCES OF COUNSEL

*Leonard Olarsch* of counsel (*L. Kevin Sheridan* with him on the brief; *Allen G. Schwartz, Corporation Counsel),* for appellants.

*Marcia B. Paul* of counsel (*Joseph G. Blum, Leo Rosen* and *Paul S. Lipson* with him on the brief; *Blum, Haimoff, Gersen, Lipson, Slavin & Szabad* and *Greenbaum, Wolff & Ernst,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

At issue is the propriety and constitutionality of the Landmarks Preservation Commission's designation of the Meeting House of the Society for Ethical Culture in the City of New York as a landmark.

The Society for Ethical Culture is a religious, educational and charitable organization, with tax-exempt status, founded in 1876 "to unite in one group, in one bond, those who had * * * religious feeling and those who simply cared for moral betterment. [Its] ethical religion has its basis in the effort to improve the world and [its members] morally." The society is the fee owner of an entire 200-foot block front, located on Central Park West between 63rd and 64th Streets, consisting of 20,000 square feet, and the two buildings situated thereon. One building, the religious meeting house (Meeting House),

serves as the society's New York headquarters; the other is the society's Ethical Culture School.

Each building is a five-story structure. The buildings are the subject of a single mortgage. They share building services, including a common boiler, interior accessways, and utilities. An auditorium occupies the first three stories of the Meeting House. The fourth and fifth floors contain administrative offices, small meeting rooms and a ceremonial hall used for meetings, weddings and other society activities. Despite the sharing of common services, the buildings are structurally independent. The school was completed in 1904, and the Meeting House was built six years later. Only the Meeting House has received landmark designation. It occupies approximately 40% of the Central Park West property, the value of which has been estimated at about $4,000,000.

The facade of the Meeting House was constructed in an architectural style known as *art nouveau,* popularized in Europe in the late 19th century. A contemporary account by a commentator in *Architecture* magazine noted that the building was "certainly quite the best piece of Art Nouveau architecture yet designed in this country, and compares well with the magnificent German department store buildings whose excellence is so great as to almost promise a future for this style."[1]

The Landmarks Preservation Commission was created by the city council, *inter alia,* to protect and perpetuate "the city's cultural, social, economic, political and architectural history" by designating historic districts and landmarks. (Administrative Code of City of New York, § 205-1.0, subd b, par [a].) At the time of the designation the 11-member commission was made up of three architects, two historians, one realtor, one city planner, three businessmen, and one educator.

A landmark is defined as "[a]ny improvement, any part of which is thirty years old or older, which has a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation" (Administrative Code, § 207-1.0, subd n). If, after an investigation of the premises or area under consideration, the commission is disposed to decree landmark status,

---

1. From Determination of Landmarks Preservation Commission, July 23, 1974, No. 5, LP-0831.

it must conduct a public hearing. (Administrative Code, § 207-2.0.)

Landmark designation status subjects a property owner to an elaborate regulatory scheme which prohibits, without prior commission approval, the alteration, reconstruction, or demolition of the subject property. The statute would require the society, at its own expense, to keep the exterior of the Meeting House in good repair. (Administrative Code, §§ 207-4.0, 207-10.0.) Violations of certain of the provisions of the law would subject the society, and even its individual members, to criminal penalties. (Administrative Code, § 207-16.0.)

In the case of commercial property there is provision to alleviate financial hardship resulting from landmark designation in instances where economic return is insufficient. The property owner may seek a real estate tax exemption or remission. This countervailing compensatory provision, however, does not apply to the society, which, as a religious, educational and charitable organization is tax exempt, pursuant to section 421 of the Real Property Tax Law.

Public hearings were held on September 25 and November 27, 1973, at which the society unsuccessfully contested the proposed designation. On July 23, 1974, the commission gave the Meeting House landmark status.

Subsequently, the society commenced an article 78 proceeding to annul the commission's designation, alleging, *inter alia,* that the designation was arbitrary and capricious and that the Landmarks Preservation Law (Administrative Code, ch 8-A) as it applied to the Meeting House, was unconstitutional, because it resulted in a taking without just compensation, and violated the free exercise of religion clauses of the United States and New York State Constitutions. In ruling on a motion challenging the propriety of using an article 78 proceeding to seek a declaration of unconstitutionality, Special Term converted the proceeding to an action for declaratory judgment.

As a result of a second motion for summary judgment dismissing the petition, a trial was ordered, after which the court found that the designation was "confiscatory, unconstitutional, arbitrary and unreasonable", and enjoined the city and the commission from interfering with the society's use of the Meeting House and the land upon which it was situated. Trial Term noted that there was no substantial evidence that the Meeting House was "an architectural masterpiece, or of significant historical value", and "[t]hat the restrictions are

not only a hardship but interfere with the religious, educational, and charitable purposes of the [society]." This appeal followed.

The commission argues, as it did at nisi prius, that the society can prevail on a theory of unjust taking only if it is able to show that the restriction prevents or seriously interferes with the accomplishment of its charitable purposes, and that any claim of hardship incurred by the society because it is required to keep the building in good repair is premature since no action has been taken against it for failure to maintain.

At the outset, an issue is raised as to the proper standard of review in determining whether the commission abused its discretion in designating the Meeting House a landmark. The commission argues that Trial Term erred in applying the substantial evidence test, and claims that the appropriate measure for reviewing administrative action is whether the decision had a rational basis.

■ The Court of Appeals has noted that appellate courts may not upset the determination of an administrative tribunal, where a hearing has been held, if there is substantial evidence to support the finding. *(Matter of Pell v Board of Educ.,* 34 NY2d 222, 230; see, also, Cohen and Karger, Powers of the New York Court of Appeals, § 108, p 460.) The court stated that "[t]he approach is the same when the issue concerns the exercise of discretion by the administrative tribunal: The courts cannot interfere unless there is no rational basis for the exercise of discretion or the action complained of is 'arbitrary and capricious.' " *(Matter of Pell, supra,* pp 230-231, citing Cohen and Karger, Powers of the New York Court of Appeals, pp 460-461.) But whether dealing with a finding of fact after hearing or an exercise of discretion "[r]ationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard." *(Matter of Pell,* 34 NY2d 222, 231, *supra;* see, also, *Matter of 125 Bar Corp. v State Liq. Auth.,* 24 NY2d 174, 178; *Matter of Sled Hill Cafe v Hostetter,* 22 NY2d 607, 613.) Thus, in the case at bar, our inquiry is directed to a determination of whether the commission's designation had a rational basis or, if, as the society contends, it was arbitrary and capricious. (See *Lutheran Church in Amer. v City of New York,* 35 NY2d 121, 128, n 2, 133.)

■ As already noted, the standard for designation is that

the proposed landmark possess "a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation" (Administrative Code, § 207-1.0), subd n). The panel of commission experts, among which were historians and architects, found that the Meeting House was "a rare, fine and irreplaceable example of *art nouveau* architecture in New York City, that it is one of the finest works of architect Robert D. Kohn, who had a special interest in the Ethical Movement as a leader and as President of the New York Society, and that it is both a tangible symbol of the Society's permanent social contribution and a rich architectural element of the fabric of our City." In making this finding the commission relied on the history of the society, which was founded in 1876; the architecture of the building itself; and the account in *Architecture* magazine, which referred to the building as "certainly quite the best piece of Art Nouveau architecture yet designed in this country." Thus, there was a rational basis for the finding and designation of the Meeting House as a landmark, and Trial Term's statement that "all that was shown was that it was Art Nouveau, serving a questionable environmental purpose and the history only that of the Society" was a subjective substitution of its judgment for that of the commission's historians and architects. Because the building has an architectural quality that is unique, it has a special character, and the fact that it has served as the Meeting House of the society since 1910, a period which is well over half of the society's existence, gives it an historical significance in the heritage of New York City.

The society points out that there is no evidence to suggest that the Meeting House is of extraordinary architectural distinction or that it was ever the scene of any noted historical event or the residence of any noted personage. While relevant, this is not determinative. If the preservation of landmarks were limited to only that which has extraordinary distinction or enjoys popular appeal, much of what is rare and precious in our architectural and historical heritage would soon disappear. It is the function of the Landmarks Preservation Commission to ensure the continued existence of those landmarks which lack the widespread appeal to preserve themselves.

In view of our finding that there was a rational basis for the designation, there remain for consideration only the constitu-

tional questions raised. It has been recognized, "in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized values." *(Penn Cent. Transp. Co. v New York City,* 438 US 104, 124.) "Where government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply noncompensable regulation." *(Lutheran Church in Amer. v City of New York,* 35 NY2d 121, 129, *supra.)* "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every * * * change in the general law." *(Pennsylvania Coal Co. v Mahon,* 260 US 393, 413.)

Merely because the State has the authority to regulate certain affairs, however, does not mean that it has the power to zone a property owner into bankruptcy or sacrifice his existence on the altar of architectual or historical preservation. "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *(Pennsylvania Coal Co., supra,* p 415.)

Although "[t]here is no set formula to determine where regulation ends and taking begins" *(Goldblatt v Town of Hempstead,* 369 US 590, 594), there are standards by which to determine whether regulation has gone too far. "The criterion for commercial property is where the continuance of the landmark prevents the owner from obtaining an adequate return. A comparable test for a charity would be where maintenance of the landmark either physically or financially prevents or seriously interferes with carrying out the charitable purpose." *(Matter of Sailors' Snug Harbor v Platt,* 29 AD2d 376, 378; see, also, *Lutheran Church in Amer. v City of New York,* 35 NY2d 121, *supra.)*

As already indicated, the society, a charitable organization, is unable to benefit from the ameliorative provisions of subdivision c of section 207-8.0 of the Administrative Code of the City of New York, which allow for a real estate tax exemption or abatement where landmark status would work a financial hardship. Hence, if the society could show that an undue financial hardship was imposed, either it must be given other financial relief or the designation must fail.

The threshold question then is whether maintenance of the

Meeting House as a landmark would seriously interfere with the society carrying out its charitable purpose. The society, citing the physical inadequacy of the school building and the economic obsolescence of the turn-of-the-century Meeting House with its wasted space, argues that the designation interferes with the accomplishment of its plans for demolition of both buildings, redevelopment of the site and use of the revenues generated therefrom for its charitable purposes.

The commission characterizes the society's argument as the "highest and best use" theory, claiming that what the society seeks, in essence, is to obtain maximum economic advantage from the property, and argues that this is not a criterion in determining whether the designation of landmark status is constitutional. The society rejects this characterization and maintains that the interdependence of the two buildings renders impractical any renovation of the school building without a similar undertaking as to the Meeting House. On the other hand, if the school is to be demolished, development of only that portion—unencumbered by the designation—is not economically feasible. Thus, the society contends, to the extent that the designation prohibits demolition of the Meeting House, it is confiscatory.

Landmarks regulation inevitably has a restricting or adverse effect on property and its owner, charitable or otherwise. In *Snug Harbor* (29 AD2d 376, 378, *supra)*, the court, in determining whether there was a taking, noted that "the answer would depend on the proper resolution of subsidiary questions, [including] * * * whether the preservation of these buildings would seriously interfere with the use of the property". In *Lutheran Church in Amer. v City of New York* (35 NY2d 121, 129, *supra)*, upon which the society places great reliance, the court, in striking the designation, took note "that the use to which the property has been put for over 20 years would have to cease because of the inability under the designation to replace the building."[2]

At this juncture some factual background would be helpful in placing the matter in proper perspective. In the middle to late 1960's, the society began to explore the feasibility of developing the Central Park West property, which had become "desirable and unique" because of its proximity to Lincoln

---

2. The property designated as a landmark had been used as an office, but increasing office space requirements had rendered it obsolete.

Center. Several proposals were considered. The most appealing was a plan calling for the demolition of the school and Meeting House, high-rise development of the entire site, and lease of the property to a developer for 99 years at an annual ground rent of $175,000. According to this proposal, a high-rise, 800 unit, 240,000 square-foot luxury apartment building was to be built, in which the society would occupy 27,500 square feet on the lower floors. On the basis of the ground rent, it was estimated that the society would contemplate receipt of $2,000,000 in mortgage loan money to be applied toward "new facilities for its school on another site or toward its other charitable purposes." As envisioned by the society, the property was, in effect, to be commercially used to generate funds for its charitable purposes. Thus, it appears that the society's dominant purpose was not so much to effect improvement of inadequate or outmoded buildings as it was to exploit the development potential of the site for financial gain, albeit for charitable purposes. This is evidenced by the fact that the society is not satisfied to develop the portion of the site on which the school is situated. This part, representing 60% of the parcel, is unrestricted and can itself be further enhanced by utilization of development rights from the Meeting House site.

Although any owner is free to develop his property, all property owners, commercial or charitable, are subject to valid governmental land use regulation, including regulation which may deprive the owner of the full exploitation value of his property. Unlike *Lutheran Church in Amer. v City of New York* (35 NY2d 121, *supra),* no interference with a hitherto existing charitable purpose or function will result from landmark designation. The designation does not deprive the society of the present use of the Meeting House, but instead would prevent it from altering or, more specifically demolishing the building, without prior commission approval, to exploit the full economic potential of the Central Park West site. The only hardship upon the society is speculative upon a prospective use of the property, i.e., large scale development and the revenues to accrue therefrom.

If, as the society contends, the buildings are outmoded and unsuitable for present needs, this was a condition which existed before it began to explore the possible avenues of site development. The society's plans had to be abandoned in 1971, at least two years before the public hearings and some three

years before the landmark designation, because of the then depressed real estate market in New York City. Thus, it appears that market conditions, and not the designation, prevented the society from taking remedial action to cure the buildings' shortcomings.

The society attacks the commission's "highest and best use" characterization of its plans for the property as missing the point of its charitable purposes and concomitant freedom to pursue those purposes in whatever way it deems fit. Any regulation which frustrates the charitable purposes of the organization and imposes hardship, the society argues, is unconstitutional. However one chooses to characterize the society's plans, it is settled law that "the fact that [an ordinance] deprives * * * property of its most beneficial use does not render it unconstitutional" (Goldblatt v Town of Hempstead, 369 US 590, 592, supra), and, to our knowledge, there is no authority which excludes a charitable owner from the application of this rule. Of course, "[t]he economic impact of the regulation * * * and the extent to which regulation has interfered with distinct investment-backed expectations are * * * relevant considerations" in determining whether the regulation untowardly affects the anticipated use of the property. (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra.) For over 60 years the Meeting House has served the same function for the society for which it was constructed and there is no evidence that the property was ever purchased for investment purposes.

The commission also argues that the society's claims of hardship and interference are premature since there has been no proof of the projected costs of maintenance of the Meeting House's exterior, and no action has been taken against the society for failure to maintain in good repair. The commission also notes that the maintenance required for the exterior is no more than that prudently required for the preservation of the society's interest in the building. Nonetheless, the society's rights to alienate the property are seriously constrained by the designation, since it is fairly obvious that any sale would have to be at a price substantially lower than if the property were free of the designation. As Trial Term pointed out, "permission to demolish 'quite probably would not be forthcoming' ", so that any application for alteration would be futile. Consequently, to the extent that the designation impairs the value of the property, we believe that the claim of

hardship is not premature. (See *Board of Coop. Educational Servs. v Goldin,* 38 AD2d 267, 272.)

Although Trial Term never reached the issue because it found the designation confiscatory, as applied, as well as arbitrary and capricious, the society also argues that the landmark designation constitutes an undue interference with the free exercise of religion in violation of the First Amendment of the United States Constitution, and section 3 of article I of the New York State Constitution. In support it cites *Matter of Westchester Reform Temple v Brown* (22 NY2d 488), which held unconstitutional, as applied, a zoning statute which would have prohibited the construction of a synagogue with adjacent parking space. Although voiding the application of the statute the court noted (p 496) that "[r]eligious structures enjoy a constitutionally protected status which severely curtails the permissible extent of governmental regulation in the name of the police powers, but the power of the regulation has not been altogether obliterated." Unlike the congregation in *Westchester,* the society does not seek simply to replace a religious facility with a new, larger facility. Instead, using the need to replace as justification, it seeks the unbridled right to develop its property as it sees fit. This is impermissible, and the restriction here involved cannot be deemed an abridgement of any First Amendment freedom, particularly when the contemplated use, or a large part of it, is wholly unrelated to the exercise of religion, except for the tangential benefit of raising revenue through development.

At this time the society has not been interfered with in the exercise of its religion. If, at some point in the future, it decides to seek permission to replace the present Meeting House with a larger one designed to meet the needs which a clearly outmoded building could not provide, and is denied permission, then perhaps a claim of unjust taking or First Amendment impairment might lie. Of course, should the society seek to replace the Meeting House to develop the property to its full economic potential, any claim of building obsolescence might be suspect. In the final analysis, obsolescence should be measured by the society's needs, not on the prospects for development of a valuable piece of property.

Accordingly, the judgment, Supreme Court, New York County (BAER, J.), entered January 15, 1976, annulling the designation of petitioner's Meeting House as a New York City

landmark, should be reversed, on the law, without costs or disbursements, and the designation declared valid.

SANDLER, J. P., LANE, LUPIANO and SILVERMAN, JJ., concur.

Judgment, Supreme Court, New York, entered on January 15, 1976, reversed, on the law, without costs and without disbursements, the judgment vacated and the designation of petitioner's Meeting House as a New York City landmark declared valid.