Matter of Save America's Clocks, Inc. v City of New York (2017 NY Slip Op 08457)





Matter of Save America's Clocks, Inc. v City of New York


2017 NY Slip Op 08457


Decided on November 30, 2017


Appellate Division, First Department


Gesmer, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 30, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta,P.J.
Peter Tom
Barbara R. Kapnick
Marcy L. Kahn
Ellen Gesmer, JJ.


101109/15 3422 

[*1]In re Save America's Clocks, Inc., et al., Petitioners-Respondents, 
v
City of New York, etc., et al., Respondents-Appellants.



Respondents appeal from the order and judgment (one paper) of the Supreme Court, New York County (Lynn R. Kotler, J.), entered May 17, 2016, granting the petition brought pursuant to CPLR article 78 to annul the Certificate of Appropriateness, issued May 29, 2015, which authorized work on certain features of a designated interior landmark.




Zachary W. Carter, Corporation Counsel, New York (Diana Lawless and Devin Slack of counsel), for City of New York, Office of the Deputy Mayor for Housing and Economic Development, New York City Landmarks Preservation Commission and New York City Department of Buildings, appellants.
Kramer Levin Naftalis & Frankel LLP, New York (Jeffrey L. Braun and Catherine L. Hoge of counsel), for Civic Center Community Group Broadway LLC, appellant.
Hiller, PC, New York (Michael S. Hiller and Jason E. Zakai of counsel), for respondents.



GESMER, J.


This case marks the first time an owner has asked to convert an interior landmark into a private residence. The decision by the Landmarks Preservation Commission (LPC) that petitioners seek to overturn would permit the owner, who purchased the property subject to the landmark designation, to make fundamental alterations to one of the few remaining nineteenth century nonelectrified mechanical clocktowers, which is one of New York City's 117 designated interior landmarks. In particular, the LPC decision would permit the conversion of the space containing the clocktower into a private residence, the disconnection of the clock from its [*2]historical mechanism, and the electrification of the clock. The case turns on whether, and to what degree, New York City's Landmarks Preservation and Historic Districts Law (Administrative Code of City of NY § 25-301 et seq.)
(Landmarks Law) permits the LPC to require the private owner of property purchased subject to a prior interior landmark designation to preserve the historic character and operation of the interior landmark and to continue to permit at least minimal public access to it. Because we agree with the article 78 court that the LPC's decision was based on an error of law and is irrational, we affirm.
Background
The 13 story neo-Italian Renaissance style building at 346 Broadway (the building) was constructed "using the finest craftsmanship and lavish materials" between 1894 and 1898 by the prominent architectural firm McKim, Mead & White for the New York Life Insurance Company. The building sits on the lower Manhattan block bounded by Broadway to the west, Lafayette Street to the east, Leonard Street to the north, and Catherine Lane to the south. At issue in this case is the clocktower that sits atop the western end of the building, and houses the largest of the few purely mechanical tower clocks of its kind in New York. Indeed, the only other clock in the world with a similar mechanism is the one atop Westminster Palace known as Big Ben. The clocktower's construction was supervised by William Mead and was modeled on an Italian Renaissance palazzo. A room on the 14th floor contains an interior spiral staircase which leads up to a landing housing the clock's pendulum, and then to the clocktower's machine room. The four glass and metal clock faces make up the four walls of the machine room, in the center of which the clock mechanism sits inside a glass and wood enclosure. Above the mechanism is the clock's 5,000 pound bell, which strikes the hours.
The remarkable functioning of the mechanism is described as follows in a 2014 New York Times article:
"It is significant enough that a monumental public clock has survived into the smartphone era. But what makes the clock at 346 Broadway extraordinary is that it is, to this day, a purely mechanical instrument, one that must be wound every week. Once wound up, a 1,000-pound weight drops slowly down a wooden chute from the 14th floor to a landing below, its tremendous power governed by elaborate gear works on a Gothic-style iron frame. They translate its pull into two-second pulses that drive the giant hands outside. The works are housed in a glass and wood enclosure that slightly mutes the sound: Ta-ki-ta-TAT. Ta-ki-ta-TAT. Ta-ki-ta-TAT"
(David W. Dunlap, A Tower Clock in Danger of Losing its Purpose, NY Times, Nov. 12, 2014, § A at 31).[FN1]
In 1968, New York City acquired the building, which it used to house courts and City government offices. The record shows that, from 1972 until the current owner purchased the building in 2013, the bottom level of the clocktower operated as an art gallery and performance space accessible to the public. The gallery also housed several artist studios and a public service radio station, and public events were sometimes held on the clocktower's terrace. Petitioner [*3]Marvin Schneider [FN2] gave regular public tours, and visited the clocktower on a weekly basis to inspect and wind the clock, until March 2015, when he was denied access. There is no indication in the record of the number of people who could or did visit.[FN3]
By 1980, the clock mechanism had fallen into disrepair, when city workers Marvin Schneider and Eric Reiner volunteered their time to restore the clock to working order and to wind it each week. The LPC enthusiastically urged the City to appoint a City Clock Master, stating that "[t]he clocks that grace the city's buildings are public treasures. While once common in New York only a few public clocks remain. . . . These clocks are not simply decorative elements on distinguished buildings, they are truly urban amenities." In 1992, Mayor Dinkins appointed Mr. Schneider as Clock Master of the City of New York and, at the appointment ceremony, stated that the city's few remaining
"large mechanical clocks prominently displayed on buildings . . . were works of art, not only because of the manner in which they were designed and decorated, but also because of the elegant complexity of their mechanical 'innards.' These clocks are driven by mechanisms that were delicate and well balanced enough to keep time accurately but were durable enough to last for years. It is crucial that we carefully preserve and safeguard our City's architectural heritage, and the large mechanical clocks are an especially public and important part of that heritage"
Mr. Schneider continued to wind, oil, and maintain the clock, and gave weekly tours of the clocktower to members of the public, from in or about 1980 until 2015, when the current building owner concededly prevented him from doing so.[FN4]
In 1989, while the building was still owned by the City of New York, the LPC designated it as an Interior Landmark. The Interior Designation Report, completed in 1987, specifically singled out the "interior consisting of the clocktower gallery at the western end of the building and the spiral staircase leading to the clocktower machinery room; . . . interior consisting of the clocktower machinery room . . . , and the fixtures and interior components of these spaces, including but not limited to . . . [the] clock machinery." In making this designation, the LPC made a finding that the building and the designated portions of its interior have
"a special character, special historical and aesthetic interest and value as part of the development, heritage and cultural characteristics of New York City, and the Interior or parts thereof are thirty [*4]years old or more, and that the Interior is one which is customarily open and accessible to the public, and to which the public is customarily invited."
In 2012, the City decided to sell the building to respondent Civic Center Community Group Broadway LLC (owner) based on its plan to repurpose the building as "a combination of residential hotel, retail [uses], and a community facility used for a digital media arts center." The Mayor's Office issued a Negative Declaration, applying to the building and a nearby site, which concluded that the proposed project "would not result in significant adverse impacts to any historic and cultural resources in the study area. It is expected that the project site[] at 346 Broadway . . . would undergo interior renovations and possibly exterior rehabilitation. All above ground and in-ground construction on both Landmark sites, including any . . . work on the LPC-designated interior landmark would require LPC review and issuance of an LPC permit."
In December 2013, the City sold the Building to the owner. Our opposing colleague essentially ignores the fact that the deed provides that the purchase was subject, inter alia, to: "Covenants, conditions, easements, leases and agreements of record[:] a. Notice of Landmark Designation recorded May 25, 1989 in Reel 1580 Lot 1448."
Before the purchase was completed, some of the individuals involved in maintaining the clocktower met with representatives of the new owner and demonstrated the machinery of the hand-wound mechanical clock.
In October 2014, the owner submitted to the LPC an application for a Certificate of Appropriateness (COA) seeking permission to refurbish the building's exterior and interior and to modify some of the landmarked interior spaces. In particular, the application requested permission to convert the clocktower into a triplex private apartment, to disconnect the clock from its mechanism, and to electrify the clock.
The LPC held a public hearing on the owner's application on November 18, 2014 and a public meeting on December 16, 2014. At the beginning of the hearing, the owner's architects made a presentation about the proposal, stating in answer to a question that "the clocktower . . . is a very unique space, and the clock itself is very special." One of the Commissioners then noted that interior landmark designations are made "for the public benefit, and it seems to me that this [clocktower is] especially an interior that warrants that kind of public interaction" and asked whether it was feasible to make the clocktower open to the public to some degree. In response, the owner's architect stated that it might be possible but it was not their intention to do so. The LPC's counsel responded that the LPC does not have "power under the Landmarks law to require interior-designated spaces to remain public" and "to require that [the clock] mechanism remain operable." Commissioner Goldblum asked if the clocktower would become private space and then asked:
"Comm. Goldblum: So [the clocktower apartment owner] can store his suitcases up there.
"Counsel: Correct."
Some of the witnesses, while generally expressing support for the broad outlines of the plan, questioned LPC counsel's interpretation of the Landmarks Law as to interior landmarks. The co-chair of the Landmarks Committee of the Community Board testified that part of the LPC's mandate is "to keep the clock working . . . and a directive must be put in place and in force to keep the clock working." A representative of the Historic Districts Council argued that "the exclusive private use of an interior landmark challenges the authority of the Landmarks Preservation Commission to protect our city's historic built environment." A representative of the Society for the Architecture of the City suggested that the LPC did not have the power to approve a COA that would deprive the public of access to a "beloved interior landmark." A [*5]representative of the New York Landmarks Conservancy pointed out that no interior landmark had previously been converted to private residential use. A representative of the Tribeca Trust argued that the privatization of an interior landmark "constitutes a taking of the public [commons], an erosion of the public good." Petitioner Jeremy Woodoff [FN5] testified that
"the current proposal, which would leave the clock mechanism hidden, privatized, not working and at risk . . . would be a great loss to the understanding of the 19th Century American horological advances and refinements and would destroy the historic relationship between the mechanism, clocktower and public time-telling function so carefully encompassed by the [Landmark] designation."
The Chair of the Commission continued to question whether the owner could reconfigure the proposal so that the clocktower would not be within a private apartment, and would be accessible, at least to the other residents of the building, suggesting that there might be some more "utility and benefit" to making the clocktower "more public" and that the LPC should have the ability to regulate "anything happening within that space."[FN6] Other Commissioners raised similar questions about maintaining some degree of public access to the clock, and maintaining the historical mechanism. One commented that making the clock digital is "not a preservation of the clock." However, the Commissioners did not directly question the LPC counsel's opinion that they did not have authority to regulate access to the clocktower. The Chair concluded, "it seems like it's impossible for us to enforce." Before the conclusion of the public hearing, Commissioner Devonshire suggested that the Commissioners visit the clocktower rooms since it was such a "hot button" issue. Several of the Commissioners did so.
The Friends of 346 Broadway, which includes several of the institutional and individual petitioners as well as representatives of various horological, architectural and historical organizations, submitted written testimony to the LPC. They noted that, if the clock mechanism continues to be maintained, "it will last essentially forever. It will not 'wear out' or need [*6]replacement with a modern mechanism." However, the removal or alteration of any of the mechanism's parts "would destroy its integrity," because its "significance is based on its functional technology."[FN7]
At the beginning of the public meeting, the owner's architect stated that the owner's main reason for deciding to electrify the clock was to avoid anyone having to pass through a private living space to wind and maintain it. The architect could not confirm that all of the clock's mechanism would remain in place. However, upon questioning by the Commissioners, the architect confirmed that one could access the clock mechanism without passing through the living space of the proposed triplex apartment.
During the meeting, the LPC's counsel reiterated his opinion, stated earlier, that the LPC did not have authority to regulate the continued functioning of the clock mechanism or to require access. Seven of the eight Commissioners, including the Chair, spoke to this issue [FN8]. All but Commissioner Baron stated that they would prefer to mandate that the historic mechanism continue to operate, but that they believed, after hearing the LPC counsel's opinion, that the LPC did not have the authority to do so (Goldblum: "it comes down to what I personally, or others, might like the law to be and what the law is;" Gustafsson: "I think we, the Commissioners, all would love to . . . have the clock function the way it used to . . . . I think that [LPC's counsel] mentioned . . . that we don't require [windows and doors] to work the way they used to work . . ., and what we worry about is the way they look;" Moore: "[r]equiring an owner to operate a mechanism is not something we have done . . . for that clock to move electrically . . . . It's not the hand winding, which would be great, and I'd love to know that that's happening . . .;" Chapin: "it would be "very nice" to maintain the mechanism function, but the LPC can't regulate that; Washington: "I would like to see it continue to be serviced and to function the way it functions without the electronic part . . . and apparently, [this] is not . . . something we can mandate;" Chair Srinivasan: the requirement that the clock mechanism be maintained by a worker who would enter from the roof so as not to disturb the occupant "is not really within the purview of the [LPC]").
Commissioner Baron questioned the attorney's opinion, expressing her concern that the clocktower would be located within a privately owned apartment, and as a result, would be disconnected from its historic mechanism and operated electrically, even though its unique mechanism was part of the reason for its designation. Accordingly, she voiced her dissent to the approval of the changes to the clock. Since the Rules of the City of New York require only six votes for a final determination (63 RCNY 1-04), the LPC approved the COA. Accordingly, seven Commissioners expressed their preference to require that the mechanism not be disconnected and continue to function, and their belief in counsel's opinion that they could not do so. Had they voted their preference, the application would not have passed. Similarly, had the three Commissioners who spoke in support of some form of continued public access to the clocktower voted against the proposal, and the remaining five Commissioners voted in favor of it, the proposal would not have passed.
The COA, issued on May 29, 2015, grants the owner permission to convert the clocktower into a luxury triplex condominium apartment. It requires that the owner record a restrictive declaration against the property that provides, inter alia,
"for the permanent operation of the exterior clock faces of the clocktower by electronic or mechanical means, . . . for a cyclical inspection, reporting and maintenance program for the designated interior spaces on the upper floors that would be converted to residential use, . . . and that [the owner] and subsequent owners would provide reasonable access to the designated interior spaces to the LPC for periodic inspections and in response to reasonably credible complaints."
Despite the LPC counsel's opinion that the LPC is without authority to require continued public access to an interior landmark, the COA also directed that the owner execute and record a restrictive declaration requiring that the owner provide public access to the "main Banking Hall," another of the building's interior landmarks, and not use it for residential purposes.
Petitioners commenced this CPLR article 78 proceeding on June 17, 2015. On March 31, 2016, the motion court issued a decision, followed by an order and judgment entered on May 17, 2016, in which it granted the petition by partially annulling the COA to the extent that the COA allows work inside the clocktower that would completely eliminate public access, and allows work that would convert the clock from a mechanical to an electrical system of operation. The motion court concluded that the LPC's approval of the COA was affected by a mistake of law, to the extent that it approved the electrification of the clock and the elimination of public access to the clocktower, and that it lacked a rational basis for its decision on the public access issue. Respondents now appeal.
Standard of Review
While we agree with our colleague that rational basis is the correct standard of review, we view the LPC's determination as being both irrational and affected by an error of law. In particular, the LPC's determination was clearly based on the opinion expressed by its counsel that it had no authority to require public access of any kind to an interior landmark, and to require that the clock's historic mechanism continue to operate [FN9]. For the reasons discussed more fully below, we find that counsel's opinion was incorrect, and therefore, that the LPC's reliance on it requires that the article 78 petition be granted.
The LPC Chair and two Commissioners expressed a preference that the LPC require some level of continued public access to the clocktower, and a belief that they did not have the authority to require this. Seven of the eight Commissioners, including the Chair, expressed a clear preference that the clock mechanism continue to run, and a belief that they did not have the authority to require this. Had those Commissioners not followed the erroneous legal opinion and instead voted their preference consistent with their expertise, the proposal would not have passed. Indeed, at oral argument before the motion court, the City continued to take the position, as it does before this Court, that the opinion expressed by the LPC's attorney, at the hearing and the public meeting, was correct as to the limits of the LPC's authority. Therefore, we disagree [*7]with our colleague to the extent that she finds that there is any ambiguity as to the LPC's reliance on counsel's opinion.
Moreover, we should not defer to the inaccurate legal opinion stated by LPC's legal counsel, and the Commissioners' reliance on it, because the authority of the LPC under the Landmarks Law to regulate public access to the clocktower and mechanical operation of the clock is purely a question of law and not an area within the LPC's expertise (Matter of Teachers Ins. & Annuity Assn. of Am. v City of New York, 82 NY2d 35, 42 [1993] ["Such deference . . . is not required where the question is one of pure legal interpretation"]). In Teachers, the Court of Appeals held that the interpretation of the phrase "customarily open or accessible to the public" in section 25-302(m) of the Landmarks Law is a question of law, and does not require judicial deference, including to the LPC's prior practice, since the statutory language is clear on its face (id. at 42-44, n 1). Similarly, the interpretation of whether the clock mechanism is encompassed by the statutory term "architectural feature" (Landmarks Law § 25-302[1]), the use and preservation of which the LPC has authority to regulate, constitutes a question of law. We disagree with our colleague's view to the contrary.
The Clock Mechanism
We hold that the LPC has authority under the Landmarks Law to regulate the clock mechanism for two reasons.
First, this result effectuates the statutory purposes. The Landmarks Law, New York City's first historic preservation statute, was enacted in 1965, in response to the City's loss of a number of its more significant historic structures, including the original Pennsylvania Station. It was amended in 1973 to authorize the LPC to designate interior landmarks and promote their use (Teachers, 82 NY2d at 41). It declares that "the protection, enhancement, perpetuation and use of improvements [FN10] . . . of special character or special historical or aesthetic interest or value is a public necessity and is required in the interest of the health, prosperity, safety and welfare of the people" (Landmarks Law § 25-301[b]). The purposes of the Landmarks Law include the
"protection, enhancement and perpetuation of such improvements . . . which represent or reflect elements of the city's cultural, social, economic, political and architectural history; . . . [the] foster[ing of] civic pride in the beauty and noble accomplishments of the past; . . . protect[ing] and enhance[ing] the city's attractions to tourists and visitors and the support and stimulus to business and industry thereby provided; . . . [and] promot[ing] the use of . . . interior landmarks . . . for the education, pleasure and welfare of the people of the city"(Landmarks Law § 25-301[b]).
The LPC is required, in considering an application for a COA, to "determine whether the proposed work would be appropriate for and consistent with the effectuation of the purposes of this chapter" (Landmarks Law § 25-307[a]). Similarly, in determining an application for permission to alter or reconstruct an interior landmark, "the commission shall consider the effects of the proposed work upon the protection, enhancement, perpetuation and use of the interior architectural features of such interior landmark which cause it to possess a special character or special historical or aesthetic interest or value" (Landmarks Law § 25-307[e]). The Interior Designation Report notes that the "clock and clocktower interior, which have not been altered, are a rarity in New York City . . . . The clock is one of the few remaining in New York which [*8]has not been electrified." Consistent with this, the LPC designated as an interior landmark the "fourteenth floor interior consisting of the clocktower machinery room . . . and the fixtures and interior components of these spaces, including but not limited to, . . . clock machinery."[FN11] Thus, the clock's mechanism represents an element of the city's cultural and economic history and contributes to the building's historical value, and maintaining it would promote pride in the "accomplishments of the past" and advance the statutory purposes. This view was shared by all but one of the Commissioners, the Chair, and several speakers at the hearing, including a representative of the New York Landmarks Conservancy, and petitioners Marvin Schneider and Jeremy Woodoff.
Second, the Landmarks Law defines the term "interior architectural feature" to include the "components of an interior, including, but not limited to . . . the type and style of all . . . fixtures appurtenant to such interior" (Landmarks Law § 25-302[l]). The Landmarks Law permits the LPC to "apply or impose, with respect to the construction, reconstruction, alteration, demolition or use of [a designated landmark] or the performance of minor work thereon, regulations, limitations, determinations or conditions which are more restrictive than those prescribed or made by or pursuant to other provisions of law applicable to such activities, work or use" (Landmarks Law § 25-304[b] [emphasis added]). This language clearly gives the LPC authority to require the owner to run the clock by its still functioning mechanism and to deny the request to electrify it.
Indeed, there would be little point in designating the machinery as a landmark without an expectation that it would continue to operate for so long as it can. As Assistant City Clock Master Forest Markowitz commented at the hearing, disconnecting the mechanism and electrifying the landmarked clock would be analogous to replacing the engine of a classic car with a modern engine: "he would now have a Chevy Volt and not a 1948 Dodge."
Nevertheless, our colleague would find that the LPC's determination was rational and not affected by an error of law, even though there was testimony at the public hearing that disconnecting the mechanism would, at best, place the clock mechanism at risk, and, at worst, destroy it, and despite the fact that six of the Commissioners and the Chair (enough to have rejected the proposal) stated that they would have preferred that the mechanism continue to operate, but believed that they did not have the power to require this.
Our colleague states that the LPC, in approving the proposal to electrify the clock, relied on its own interpretation of "interior architectural features," rather than the legal advice of its counsel, and that, therefore, its decision is not affected by an error of law. This is wrong for two reasons. First, as discussed above, the record makes clear that six Commissioners and the Chair relied on the erroneous legal advice of counsel. Indeed, the only Commissioner who voted [*9]against the proposal, Commissioner Baron, did so because she questioned the accuracy of counsel's advice. Second, even if the Commissioners were relying on their own ideas as to what constitutes "interior architectural features" under the Landmarks Law, there can hardly be a more obvious instance of statutory interpretation, on which we owe no duty of deference to the LPC. We are not required to defer to the LPC's misunderstanding of its authority under the Landmarks Law, and we should not do so when that misunderstanding was so clearly contrary to what the Commissioners viewed as the course most in keeping with their expert consideration of the historical and aesthetic importance of the clock and its mechanism.
We also disagree with our colleague's conclusion that the LPC's approval of the clock mechanism proposal was rational. First, six Commissioners and the Chair stated that they did not want to approve it because they recognized the historical and aesthetic significance of the functioning of the clock's unique mechanism, which was part of the reason for its designation. Second, there was testimony at the hearing to the effect that disconnecting the clock from its mechanism would place it at risk or even destroy it. Indeed, the owner's architect testified that there was no guarantee that all of the mechanism would be preserved. Accordingly, our colleague's conclusion that electrification of the clock is not irrational because it will "modernize[]" it, and that the clock mechanism will be "preserved" is not supported by the record.
When the Landmarks Law was enacted in 1965, no one could have imagined the incredible technological advances in the decades to come, and the resulting vast aesthetic impact on our environment. Objects once thought of as ordinary become increasingly rare, and technologies once thought of as modern become obsolete. Their physical existence and functioning take on new meaning as connections to our history. This majestic clock, and its historically significant functioning mechanism, is a perfect example of the very reason the Landmarks Law exists, because the "protection, . . . perpetuation, and use of [objects] of special character or special historical or aesthetic interest or value is a public necessity" (Landmarks Law § 25-301[b]). The actions of the LPC in this case are contrary to that purpose. It is important that we clarify that the LPC has the authority to take the action that a majority of its Commissioners believed consistent with their expertise in preservation.
Public Access
Under the Landmarks Law, the LPC may reject a COA that would cause a designated interior to be inaccessible to the public, and may require the owner to continue to provide some degree of public access. To the extent that our colleague would hold otherwise, we disagree, based on explicit provisions of the Landmarks Law.
First, preserving the public's access to landmarked spaces furthers the statutory purpose. It is difficult to see how an interior landmark located in a private home can foster civic pride in the city's past, educate our citizens, enhance tourism and provide the stimulus to business and industry that tourism provides. Thus, the statutory purposes are thwarted if the public is denied access to the clocktower and the opportunity to view its historic mechanism. The issue in this case is not whether, as our colleague puts it, "the owners/occupants of the residential unit would be required to allow members of the public to traverse their private triplex residence," since no such residential unit has ever existed. Rather, the question is whether the building owner's proposal to transform the clocktower into a private residence violates the interior landmark designation to which its ownership is subject under the deed. We find that it does.
Second, as discussed above, the Landmarks Law gives the LPC broad authority to regulate, limit or condition proposed alterations to landmarked interiors (Landmarks Law § 25-304[b]). Indeed, the LPC exercised this very authority in the COA itself, by requiring that the owner execute a restrictive declaration that the building's landmarked banking hall shall remain open to the public and shall not be used for residential purposes. The owner has not challenged [*10]this aspect of the COA. If the LPC has authority to require a restrictive declaration that the banking hall remain open to the public, then it must have the same authority as to the clocktower. Our colleague argues that this "memorializes a voluntary pledge" by the owner. However, the owner's presentation to the LPC included a statement that the banking hall "will be a commercial space, which means it's more open to the public." This is hardly comparable to the permanent legal consequences of a restrictive declaration, which was the requirement imposed by the LPC within the exercise of its authority.
Third, as petitioners point out, the plain language of the Landmarks Law requires that, once designated, an interior landmark is and shall remain accessible by the public. Respondents' and our colleague's view that public accessibility is only a prerequisite of designation and is not required going forward is contrary to the plain language of the statute, and violates the rules of statutory construction. Both our colleague and respondents rely on section 25-302(m) of the Landmarks Law, which defines an "interior landmark" as
"an interior, or part thereof, any part of which is thirty years old or older, and which is customarily open or accessible to the public, or to which the public is customarily invited, and which has a special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation, and which has been designated as an interior landmark pursuant to the provisions of this chapter."
However, section 25-302(m) clearly describes the characteristics of interior landmarks that have previously been designated, since it uses the past perfect tense in describing an interior landmark as a space that "has been designated as an interior landmark pursuant to the provisions of this chapter." Moreover, section 48 of the General Construction Law provides that, in reading a statute, "[w]ords in the present tense include the future." Since the Landmarks Law provides that a previously designated interior landmark "is" customarily open to the public, or the public "is" customarily invited to such spaces (Landmarks Law § 25-302[m]), the Landmarks Law contemplates that interior landmarks shall remain accessible to the public in the future.
Fourth, petitioners do not dispute that reasonable limitations on the public's access to an interior landmark are permissible under the Landmarks Law, which explicitly contemplates public access by invitation (Landmarks Law § 25-302[m]). They do not seek constant access, but only some
public access, which is consistent with both the definition of an interior landmark (id.; see also Teachers, 82 NY2d at 43), and with the clocktower's historic accessibility, which, most recently, consisted of weekly tours. Unlike landmarked exteriors, which the public may enjoy at any time by walking by, interior landmarks (which include lobbies, theaters, restaurants, and, in the case of the only other upper floor interior landmark, the Rainbow Room, a bar) can usually be enjoyed only at certain times, or with other restrictions, such as, in the case of theaters, upon purchase of a ticket. However, until now, there has never been a designated interior landmark permitted to be converted into a private residential space where the public would have no access. Therefore, approval of the COA and the consequent placement of the landmarked clocktower in a private residence curtained from public view is inconsistent with the statutory definition.
Fifth, our colleague argues that the record does not show that a "majority of the LPC commissioners who voted in favor of the proposal" did so based on counsel's advice. However, the Landmarks Law requires the vote of six Commissioners for a final determination (63 RCNY § 1-04). Therefore, had only the three who expressed that they would have liked to have required some continued public access but believed they could not do so voted against the proposal, only five Commissioners would have remained to vote in favor of the COA, which would not have been sufficient for its approval.
Finally, the argument by the owner and our colleague that requiring some continued [*11]public access to the clocktower would constitute a "taking" is incorrect for two reasons. First, government regulation of private property only constitutes a taking requiring just compensation if it is not reasonably necessary to effectuate a substantial public purpose and/or does not permit the owner the reasonable beneficial use of the property (Penn Cent. Transp. Co. v City of New York, 438 US 104, 138 [1978]; see also Lingle v Chevron USA, Inc., 544 US 528, 535-40 [2005]). The Supreme Court has previously held that New York City's Landmarks Law serves a substantial public purpose,[FN12] and that the mere diminution of property value as a result of legislation designed to protect historically significant properties does not establish a taking (Penn Cent., 438 US at 129, 131). Here, the owner has not even attempted to meet its burden to show that providing some public access to the clocktower will deprive it of any beneficial use of the property (Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 499 [1987]). Instead, it argues that continuing to permit some public access to the clocktower constitutes a "per se physical taking," citing Dolan v City of Tigard (512 US 374, 391 [1994]). However, in that case, the Supreme Court did not hold that a public easement imposed by a municipality on privately owned property as a condition for a building permit constitutes an impermissible taking per se; rather, it held that, in that case, the public easement constituted a taking because the town's findings in support of it lacked the required "rough proportionality" between the public good sought and the impact of the development for which the property owner sought permits (Dolan, 512 US at 391). Accordingly, contrary to the owner's claim, the Supreme Court has not held that a public easement can never withstand constitutional scrutiny. Furthermore, as discussed above, the Supreme Court has already held that the Landmarks Law serves an "entirely permissible governmental goal" (Penn Cent., 438 US at 129) and that is not challenged here. That being the case, it is clear that closing off the public from all access to an interior landmark would vitiate the purpose of the Landmarks Law.
Our colleague echoes respondents' argument that requiring any level of public access would impose an impermissible burden on the owner because it would require modifications to "achieve ADA compliance." However, this argument fails, since the Americans with Disabilities Act (ADA) only requires removal of barriers to access where "readily achievable" (42 USC § 12182[b][2][A][iv]; 28 CFR § 36.304[a]), meaning that such alteration is "easily accomplishable and able to be carried out without much difficulty or expense" (42 USC § 12181[9]; 28 CFR § 36.304[a]). The ADA technical assistance manual specifies that removal of barriers is not "readily achievable" if it would "threaten or destroy the historic significance of a building or facility that . . . is designated as historic under State or local law" (ADA Title III Technical Assistance Manual § III-4.4200).
Moreover, our colleague fails to address the fact that the owner in this case purchased the building by a deed that provides that the purchase is subject to the landmark designation. While regulation of public access to a privately owned interior landmark might implicate constitutional issues where the owner purchased the property prior to imposition of the government regulation [*12]at issue, that is not the case here. Here, the owner purchased the building by a deed that specifies that the transfer is subject to the landmark designation; that was not true in any of the cases cited by the owner or in the opposing writing (Dolan, 512 US 374 [1994], supra; Nollan v California Coastal Commn., 483 US 825 [1987]; Loretto v Teleprompter Manhattan CATV Corp, 458 US 419 [1982]; Kaiser Aetna v United States, 444 US 164 [1979]; Nectow v City of Cambridge, 277 US 183 [1928]); Seawall Assoc. v City of New York, 74 NY2d 92 [1989], cert denied 493 US 976 [1989]). The owner cannot claim the "taking" of a right that it never had, since its ownership rights were limited by the recitation in the deed of the Landmark Designation. The owner has tacitly acknowledged these limits by not challenging the LPC's requirement that the owner execute a restrictive declaration that the building's landmarked banking hall not be converted to residential space and remain open to the public (see Lucas v South Carolina Coastal Council, 505 US 1003, 1028-1029 ["we assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the land owner's title"] [emphasis in original]; Penn Cent., 438 US at 124-125 ["taking" challenges dismissed where government action caused economic harm but "did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property'"]).
Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Lynn R. Kotler, J.), entered May 17, 20016, granting the petition brought pursuant to CPLR article 78 to annul the Certificate of Appropriateness, issued May 29, 2015, which authorized work on certain features of a designated interior landmark, should be affirmed, without costs.
All concur except Tom and Kahn, JJ. who dissent in an Opinion by Kahn, J.




KAHN, J. (dissenting)


Because I believe that respondent New York City Landmarks Preservation Commission (LPC) acted properly in issuing a Certificate of Appropriateness (COA) approving work in the landmark-designated clocktower space of the building in question, notwithstanding that the work would effectively deny public access to that portion of the building space, and in approving electronic operation of the historic clock housed in that building space while preserving its original mechanism, I respectfully dissent.
I. Factual Background
In 1987, the LPC conferred landmark status on the New York Life Insurance Building, which had been acquired by respondent City of New York (the City) in 1968. In addition to designating the exterior of the building a landmark, the LPC designated 10 interior spaces of the building spanning around 20,000 square feet as interior landmarks, including the banking hall on the ground floor, the main lobby, the clocktower gallery, the clocktower machinery room and fixtures and interior components, including the "No. 4 Striking Tower Clock" - a 5,000-pound bell driven by a 1000-pound weight and a hammer powered by two 800-pound weights, located in the "Clocktower Suite," which consists of four floors beginning on the 14th floor of the building.
In 2013, the City sold the building to respondent Civic Center Community Group Broadway LLC (Civic Center) for $145 million as part of a broader plan to redevelop the area in which the building is located.
In August 2014, Civic Center applied to the LPC for a COA in order to permit Civic Center to perform its proposed work on the building's landmark designated exterior and interior spaces in furtherance of a plan to convert the building to mixed commercial and residential use. Civic Center proposed to use the Clocktower Suite as a private triplex apartment, preserving both [*13]the Clocktower Suite and the clock's original mechanism. Under the proposal, the clock's original mechanism, although preserved, would be nonoperational, with continuous operation of the clock shifted to a newly installed electronic clock mechanism. In addition, Civic Center's proposal included provisions that the LPC would be entitled to inspect the Clocktower Suite periodically, and the clock's exterior would remain visible to the public from the street with the clock appearing outwardly unchanged.
On November 18, 2014 and December 16, 2014, the LPC held a public hearing on Civic Center's application. Some of those who testified at the hearing argued that LPC should require Civic Center to open the Clocktower Suite to the public and to preserve the original mechanical operation of the clock. During the hearing, LPC's general counsel commented that the LPC had no power under the Landmarks Preservation Law (Landmarks Law) to require that interior-designated spaces remain open to the public or that the original clock mechanism remain in operation. The architect for the work project testified that the clocktower was, in fact, then "inaccessible to the public, legally and from a practical and safety point of view."
On December 16, 2014, at the conclusion of the hearing, with eight members of the LPC present, the LPC voted to approve Civic Center's application, with seven commissioners in favor of full approval and with one commissioner dissenting in part.
On May 29, 2015, the LPC issued the COA. The COA reflected the LPC's approval of restoring of the Clocktower Suite's cast-iron spiral staircase; restoring of the "retaining the counterweight and enclosure"; disconnecting, retaining and protecting the existing clock mechanism; restoring the "wood and glass mechanism enclosure" and "electrifying the clock operation." The COA also required the owner (and its successors) to preserve the clock's mechanical components in place but permitted the owner to disconnect the clock from its mechanical system and to install an electronic operating system [FN13]. In addition, Civic Center made a Restrictive Declaration that it would provide the LPC with reasonable access to the designated interior landmark spaces for cyclical inspections and in response to reasonably credible complaints.
II. Legal Standards
Where an article 78 proceeding concerns an administrative
determination by the LPC, such as issuance of a COA, the scope of permissible judicial review is limited to two inquiries: first, whether the LPC's action has a rational basis in the record and is not arbitrary and capricious (see Matter of Teachers Ins. and Annuity Assn. of Am. v City of New York, 82 NY2d 35, 41 [1993]; Matter of Stahl York Ave. Co. LLC v City of New York, 76 AD3d 290, 295 [1st Dept 2010] lv denied 15 NY3d 714 [2010]; Matter of Society of Ethical Culture in the City of N.Y. v Spatt, 68 AD2d 112, 116 [1st Dept 1979], affd 51 NY2d 449 [1980]), and second, whether the LPC's action has "a reasonable basis in law" (Teachers Ins., 82 NY2d at 41). If an LPC determination meets each of these two basic criteria, the reviewing court must uphold it (id.).
As the agency charged with implementing the Landmarks Law (Administrative Code of City of NY §§ 25-301 - 25-322), the LPC is presumed to have developed expertise that would require deference to its interpretation of that law if not unreasonable (Teachers Ins., 82 NY2d at 42, citing Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). As the Court of Appeals has explained:
"Where the interpretation of a statute or its application involves knowledge and understanding of underlying operation practices or entails an evaluation of factual [*14]data and inferences to be drawn therefrom, the courts regularly defer to the governmental agency charged with the responsibility for administration of the statute"
(Kurcsics at 459). A reviewing court cannot substitute its own judgment for that of the LPC, as informed by its own historians and architects (see Matter of Committee to Save Beacon Theater v City of New York, 146 AD2d 397, 405 [1st Dept 1989] ["The (LPC) is a body of historical and architectural experts to whom deference should (be) given"]; see also Matter of Stahl York Ave. Co. LLC v City of New York, 76 AD3d at 295 [same]; Matter of Citineighbors Coalition of Historic Carnegie Hill v New York City Landmarks Preserv. Commn., 306 AD2d 113, 114 [1st Dept 2003], appeal dismissed 2 NY3d 727 [2004] [same]; Matter of Socy. of Ethical Culture v Spatt, 68 AD2d at 117-118 [same]).
Deference to the LPC is not required when the question is one of pure legal interpretation of a statute, however (Teachers Ins., 82 NY2d at 42, citing Matter of Moran Towing & Transp. Co. v New York State Tax Commn., 72 NY2d 166, 173 [1988]). Pure statutory interpretation is a matter of "pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent" without the need "to rely on any special competence or expertise of the administrative agency" (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d at 459).
III. Discussion
A. Public Access
1. Rational basis
Under the circumstances presented in this case, I believe that the LPC acted rationally in issuing the COA to the extent that it permitted work that would eliminate public access to the Clocktower Suite, notwithstanding the LPC's prior designation of the Clocktower Suite as an interior landmark.
The Landmarks Law defines an "interior landmark" as follows:
"An interior, or part thereof, any part of which is thirty years old or older, and which is customarily open or accessible to the public, or to which the public is customarily invited, and which has a special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation, and which has been designated as an interior landmark pursuant to the provisions of this chapter" (Administrative Code § 25-302[m]).
The Landmarks Law imposes duties on "persons in charge of an improvement containing an interior landmark" to (1) keep in good repair of all portions of the interior landmark and any improvements performed on them (Administrative Code § 25-311[b]) and (2) refrain from "alter[ing], reconstruct[ing] or demolish[ing]" any of the interior landmark without the LPC's prior approval (Administrative Code § 25-305[a][1]).
The Landmarks Law does not explicitly state that the owner of a building containing an interior landmark is required to maintain public access to that landmark in perpetuity, however.
Although a space must be "customarily open or accessible to the public, or one to which the public is customarily invited" in order to be designated as an interior landmark (Administrative Code § 25-302[m]), maintenance of public accessibility to an interior landmark has never been deemed an ongoing obligation of its owner. In the 50 years since the Landmarks Law was first enacted, "it has been the City's policy and practice that an interior landmark owner's sole obligation was to preserve its protected features of special historical or aesthetic interest or value" (Frank E. Chaney, What's Yours Is Mine: Public Access to Private NY Property, www.law360.com [April 18, 2016]). The City's adherence to this policy is illustrated by the fact that after September 11, 2001, many building lobbies that had been designated as interior [*15]landmarks were closed to the general public and only those people having business in the buildings were permitted to enter (id.). The majority's contrary view, that an owner of an interior landmark is required to maintain public accessibility in perpetuity, is without support in settled law.
The pragmatic nature of the project of landmark preservation touted by the City (and embraced by the author of the article) at least achieved continued public access to 10 designated interior spaces. The loss of public access to the Clocktower Suite, an interior space that was never capable of being widely open to the public due to its location and other structural issues, and that is highly amenable to conversion to private use, appears to be a reasonable compromise since robust public access would, as argued by respondents, "leave little to no room for residential use of the suite and, quite possibly, a broad swath of the 14th floor," or would otherwise create a logistical nightmare, and would make preservation of the suite's other architectural features impossible because such access would require renovations to make the space compliant with the Americans With Disabilities Act (ADA) and the building code.[FN14]
Nonetheless, the majority maintains that because section 25-302(m) defines "interior landmark" as a space that "has been [so] designated," the references in that definition to "[a]n interior . . which is customarily open or accessible to the public or . . . to which the public is customarily invited" amount to requirements with which owners must continuously comply even after "interior landmark" designation (Administrative Code § 25-302[m] [emphasis added]). In advancing this argument, the majority's reliance on General Construction Law § 48, which states the general principle that words set forth in the present tense in a statute include the future, is misplaced. At the outset, the general principle set forth in General Construction Law § 48 is not applicable where the statute indicates a contrary intention (see McKinney's Cons Laws of NY, Book 1, Statutes § 75 [b]). In the case of the Landmarks Law, the only express requirements set forth by the legislature were that interior landmarks be maintained in good repair (Administrative Code § 25-311[b]) and that their owners refrain from alteration, reconstruction or demolition of interior landmarks without prior approval by the LPC (Administrative Code § 25-305[a][1]). Had the legislature intended that the Landmarks Law impose requirements on owners of interior landmarks to maintain public access, the legislature would have been fully capable of saying so. The fact that the Landmarks Law does not include such an express requirement indicates that the interpretation of the phrases "is customarily open or accessible to the public" and "to which the public is customarily invited" in section 25-302(m) as imposing post-designation public access requirements on owners is not reflective of the intent of the legislature.
Further, "[t]he language of a statute is generally construed according to its natural and most obvious sense, without resorting to an artificial or forced construction" (McKinney's Cons Laws of NY, Statutes § 94). Here, the natural and most obvious sense of the language of section 25-302(m) is that it simply sets forth all of the other characteristics that an interior space must possess in order to be designated an "interior landmark" by the LPC. In interpreting the language of section 25-302 as imposing post-designation requirements on owners of interior landmarks beyond those expressly stated in other provisions of the Landmarks Law, the majority is employing an artificial and forced construction of that statute.
Furthermore, prior to issuing the COA, the LPC held extensive hearings on the public access issue, and the record evidence provides ample support for its determination. As is evident from the record, in order to provide the public with access to the Clocktower Suite, the owners/occupants of the residential unit would be required to allow members of the public to traverse their private triplex residence in order to reach the clocktower gallery and mechanism room. Additionally, provision of access to the upper three floors of the Clocktower Suite would necessarily be limited to visitors without mobility issues unless the cast iron spiral staircase leading to the 15th and 16th floors, where the existing clock pendulum and mechanism are housed, and the ceiling hatch and ladder leading to the 17th floor, where the bell is located, were supplemented with an elevator and other means of access to the upper three floors of the Clocktower Suite, which would be installed at the risk of sacrificing the integrity of the architectural features of the Clocktower Suite. These measures would impose upon Civic Center additional burdens in terms of time and cost which it did not agree to assume at the time it purchased the building, and would also inhibit Civic Center's ability to market its prime condominium unit.
Moreover, as is evident from the small floor areas of the Clocktower Suite [FN15] the number of people who would avail themselves of public access, were it afforded, would be necessarily small. Under these circumstances, the LPC's decision to grant a COA that would permit the owner to proceed with work that would preserve the integrity of the clocktower area while denying public access was a rational determination.
Relying on Matter of Society for Ethical Culture in City of New York v Spatt, the majority argues that in determining whether the LPC's effective denial of public access to the Clocktower Suite was rational, we are wrong to consider the small number of persons who would visit the Clocktower Suite should public access be required, in that among the LPC's purposes is "to ensure the continued existence of those landmarks which lack the widespread appeal to preserve themselves" (68 AD2d at 117). That argument misses the mark, however. In this case, our view that the number of visitors to the Clocktower Suite would be relatively small is based upon space limitations in the upper floors of the clocktower area, rather than any lack of public support for its preservation as a landmark, which was the concern in Spatt. Moreover, this case stands in stark contrast to Penn Central Transp. Co. v City of New York (438 US 104 [1979]), where the United States Supreme Court observed that the preservation of the facade of Grand Central Terminal achieved a substantial public purpose in being visible to millions of the City's residents, visitors and commuters (438 US at 129). In any event, in this case denial of public access to the Clocktower Suite, regardless of the number of members of the public who would have access to its upper floors, would work to preserve the architectural integrity of the [*16]clocktower by eliminating the need to install an elevator or other means of facilitating public access that might adversely impact the clocktower's interior architectural features.
Additionally, the majority argues that there is no support in the record for the notions that the public long lacked access to the clocktower, that, when it was open to the public, it was only open for weekly guided tours and that only a limited number of people could visit the upper three floors of the clocktower. The affidavit of Forest Markowitz states that he conducted almost weekly tours of the clocktower until access to the clocktower was terminated on March 10, 2015. Moreover, as the record shows, access to the upper three floors was limited to people without mobility issues, in that the 15th and 16th floors were accessible only by a cast iron staircase and the 17th floor only by a ceiling hatch and ladder.
The majority's assertion that the LPC's determination in this case is unprecedented, in that there has never been a designated interior landmark which the LPC has permitted to be converted into a private residential space without provision for public access, does not compel a contrary conclusion. The LPC's determination here, even if unprecedented, seems a reasonable compromise, given that fair provision of public access to all members of the public, including those with mobility issues, would require the installation of an elevator or other form of alternative means of safe access to the upper floors of the Clocktower Suite. As stated above, such an installation would impinge upon the integrity of the interior architectural features of the space by rendering them more difficult to see and by risking their reduction or removal in order to make way for an elevator shaft or other means of access. To the extent that petitioners view the LPC's pragmatic determination in this case as indicative of its tendency to favor private development over the preservation of, and public access to, landmarks, that concern is appropriately resolved in the political arena.
Although not required to do so, given the limitations on the scope of our review in this article 78 proceeding, were I to address the issue of whether the LPC could have properly required Civic Center to provide public access to the Clocktower Suite in perpetuity, as the majority effectively holds, I would find that such a requirement would raise issues under the Fifth Amendment's taking clause (see Nollan v California Coastal Commn., 483 US 825, 831 [1987] ["Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, . . . we have no doubt there would have been a taking"]).
The majority's reliance on Penn Central in support of the contrary view is misplaced. In Penn Central, the United States Supreme Court set forth the principle that government regulation of private property could constitute a taking "if not reasonably necessary to the effectuation of a substantial public purpose" (438 US at 127, citing Nectow v City of Cambridge, 277 US 183, 188 [1928] [governmental land use restriction "cannot be imposed if it does not bear a substantial relation to the public health, safety, morals or general welfare"]). In determining whether a governmental entity's action constitutes a taking, the consideration of the level of public good achieved by the action must be balanced against the degree of adverse impact the action would have on the owner's use of the property (see Penn Central, 438 US at 127).
The procedural postures and factual backgrounds of Penn Central and this case are markedly different, however. In Penn Central, the owners of Grand Central Terminal (GCT) brought suit against the LPC on federal constitutional grounds, alleging that its refusal to permit construction of a multistory office tower above GCT, which had previously been designated a landmark by the LPC, constituted a taking.
The facts and circumstances presented in Penn Central led the Supreme Court to conclude that the LPC's determination was not a taking, however. Specifically, the Penn Central Court found that the LPC's refusal to permit construction of the office tower achieved a substantial public purpose, in that the preservation of GCT's 42nd Street facade as an historic [*17]landmark would enhance the quality of life of millions of the City's residents, visitors and commuters "by preserving the character and desirable aesthetic features of [the City]" (438 US at 129). The Court also found that the LPC's refusal did not deprive the owner of the use of its air rights, in that those rights were transferable to other parcels in the vicinity of GCT, thereby mitigating any financial burdens imposed on the owner (438 US at 137).
Here, by contrast, were the LPC to have permitted public access to the Clocktower Suite in perpetuity, the number of members of the public visiting the Clocktower Suite would have been very few, given the record evidence as to the small size of its upper floors. This relatively small number of prospective visitors to the Clocktower Suite stands in stark contrast to the millions of people who can easily view the facade of GCT on a daily basis. Thus, while leaving the GCT facade intact achieved a substantial public purpose, in that the facade could be seen and enjoyed by many (see Penn Central, 438 US at 129), no substantial public purpose would be achieved by public access to the interior of the clocktower to a relative few. On the other hand, here, passersby will still be able to view the clock, which would remain fully operational, from the street. Moreover, as previously stated, requiring public access to the Clocktower Suite would compel its owners to allow members of the public to traverse their private residence, likely requiring them to install an elevator and take other measures to ensure the accessibility of its upper floors by all members of the public, including those with mobility issues. The result would reduce the marketability of the Clocktower Suite as a private residential unit. Thus, if I were to reach this issue, I would find that a requirement of public access would be of minimal benefit to the public at large, yet would engender substantial burdens for both Civic Center and the owners of the Clocktower Suite. Therefore, weighing the minimal public good and the substantial burden to the building owner that public access would achieve, imposition of any such requirement would, under the Penn Central principle, likely raise issues of a taking.
The majority urges that the owner cannot claim any constitutional "taking," because its ownership rights were limited by the provisions of the deed, which incorporated by reference the covenants and conditions of the landmark designation. In making that argument, the majority assumes that the landmark designation requires the owner to provide public access. As already discussed, this assumption is not supported by the Landmarks Law and cannot be read into the building's designation as a landmark. Nor is there is any express provision in either the Notice of Landmark Designation or the deed requiring the owner to maintain public access to the Clocktower Suite.
In sum, upon review of all of the record evidence in this proceeding, and according due deference to the expertise of the LPC in making its determination, I conclude that the LPC had a rational basis for approving work that would eliminate public access to the Clocktower Suite (see Teachers Ins., 82 NY2d at 41; Matter of Stahl York Ave. Co. LLC v City of New York, 76 AD3d at 295).
2. Error of law
Petitioners contend that the LPC's approval of the effective elimination of public access to the Clocktower Suite was based on an error of law, in that the LPC relied on the erroneous advice of its counsel that the LPC lacked authority to require public access.
The comments of three of the eight LPC commissioners present on December 16 to the effect that they would have preferred continued public access to the Clocktower Suite but did not have the authority to require it do not substantiate the majority's view that the LPC's determination in this regard was made in reliance upon the allegedly erroneous advice of the LPC's counsel. In any event, the LPC's counsel's advice and the stated views of those three commissioners that the LPC lacked the authority to require public access to the Clocktower Suite were correct, as there is no provision in the Landmarks Law conferring such statutory authority on the LPC. Although the majority points out that a vote of six commissioners was required for [*18]approval and that, had the three commissioners in question voted in accordance with their personal preferences, the application would have failed, again, those commissioners who believed that, regardless of their personal preferences, they could not require public access and voted accordingly were correct.
Even assuming that the LPC counsel's advice to that effect was erroneous, moreover, the record evidence is insufficient to establish that the majority of the LPC commissioners who voted in favor of the proposal did so solely based upon the belief that the LPC lacked the power to require public access or solely in reliance upon the LPC's counsel's advice to that effect. Rather, the comments of the commissioners appear to reflect the recognition that granting the general public access to the interior of the clocktower was not possible, given its space and logistical constraints ([Chair Srinivasan: "the clock tower's space and the space above where you have the mechanism, it's a very constrained space"] [Chair Srinivasan: "it's square footage that basically you cannot use, especially the topmost floor"]; [Comm. Washington: "it's not so much a question of having access to the [clock] mechanism as it is that the mechanism be serviced or maintained so that the clock works"]). At this point in the proceedings, the commissioners, who, as these comments reveal, were fully aware of the clocktower's space constraints, were considering whether, given the clocktower's limited capacity, provision of restricted public access, such as to residents of the building only, was feasible as an alternative to having the clocktower converted to a private apartment. Ultimately, after conducting a site inspection and hearing the architect's testimony that the clocktower was inaccessible to the public for legal, practical and safety reasons, the commissioners abandoned the idea of limited public access to the clocktower and concluded that conversion of the clocktower to use as a private apartment for was both feasible and acceptable.
The LPC's Chair's comment regarding "utility and benefit" to the public, made in the course of this discussion, appears to be a reference to finding a way to operate the clock in order for the public to appreciate it from the street rather than providing the general public access to the clocktower (Chair Srinivasan: referring to "utility and benefit for being more public" followed shortly thereafter by "the idea of the clock working and how it works"). The record reflects that the LPC considered the effective denial of public access to the interior of the clocktower a trade-off for the restoration of its interior architectural features, as well as the enhancement and increased public accessibility to the building as a whole (Chair Srinivasan: "I just want to comment . . . on the point of trade-offs looking at this . . . holistically. There are interior spaces within this building that are so worthy of being enhanced . . . their restoration and bringing them back to the public is such a significant benefit that I would urge [the] Commissioners to look at the entire project holistically"). As the LPC's determination could have been based upon these concerns, the majority's argument that the LPC's denial of public access was solely attributable to the commissioners' belief that they lacked the authority to require public access or upon the LPC counsel's advice to that effect is not supported by the record, and is based upon mere speculation.
The majority's position, that if the LPC has the authority to require a restrictive declaration by Civic Center that it would provide public access to the banking hall portion of the building, it must have similar authority with respect to the Clocktower Suite, is, at the outset, without legal basis. The language in the restrictive declaration regarding public access to the banking hall is not the result of a directive from the LPC that compelled Civic Center to commit to providing such access, but instead memorializes a voluntary pledge made by Civic Center in the course of applying for the COA that it would maintain public access to that area. The building owner's willingness to be subject to a restrictive declaration consistent with its stated intention to keep the banking hall open to the public does not demonstrate that the LPC has the authority to impose, over the objections of the building owner, a restrictive declaration requiring [*19]public access to the clocktower portion of the building. Moreover, as stated above, the 15th and 16th floors of the Clocktower Suite are accessible only by the cast iron staircase, and the 17th floor can be accessed only by means of a ladder leading to a ceiling hatch. In any event, any action taken by LPC with respect to the readily accessible banking hall space has no bearing on its action concerning the smaller and far less accessible clocktower space.
Therefore, the LPC's determination to approve Civic Center's proposal to perform work that would effectively deny public access to the Clocktower Suite was not based on an error of law.
B. Operation of the Clock Mechanism
1. Rational basis
I also believe that Supreme Court correctly held that the LPC had a rational basis for approving conversion of the operation of the clock from a mechanical to an electronic system. A review of the record reveals that LPC reached its conclusion based on the testimony of the owner's architect that "in effect, we are really protecting the mechanism" in that the operation of the clock would be modernized by electrification, thereby assuring its continued maintenance for the foreseeable future,[FN16] and the visibility of exterior clock faces to the public would be enhanced by LED or some other form of modernized lighting, while the clock faces would remain in their original, pristine condition. The architect also testified that a clear glass liner would be installed on the inside faces of the clock, thereby protecting the original clock mechanism from the weather and preserving its elements. In addition, both the Civic Center's proposal and the LPC's COA included the requirement of preservation of the original clock mechanism intact, to the extent feasible.
There is no basis for concluding that, as the majority argues, the LPC's determination was based solely upon the LPC's counsel's advice that the LPC lacked the authority to require that the clock be mechanized. There were other reasons upon which the LPC may well have based their determination. The electrification of the clock maintains its interior while balancing its owner's interest in making use of its property. Moreover, the operation of the clock would not appear to be different to the general public, while the owner would be relieved of the heavy burden of continuing to allow for and preserve its mechanical operation.
Petitioners argue that it was irrational for the LPC to allow for the conversion to electric operation because the primary reason the LPC designated this interior landmark was the clock's special and rare mechanism. However, petitioners fail to show that a key purpose of the designation was to keep the mechanism in actual operation, as opposed to ensuring the preservation of that mechanism.
In any event, given their expertise, the LPC commissioners were best situated to determine that the clock could be preserved by allowing the owner to maintain it electronically while keeping its original mechanism intact (Teachers Ins., 82 NY2d at 42; Matter of Stahl York Ave. Co. LLC v City of New York, 76 AD3d at 295)). Petitioners' dissatisfaction with the loss of use of a rare clock mechanism is insufficient to warrant annulment of that portion of the COA which permits the work of disengaging the clock mechanical operating system and installing the electronic operating system on the basis that the LPC acted irrationally or arbitrarily.
Therefore, upon review of all of the record evidence, and giving due deference to the expertise of the LPC, I would conclude that the LPC had a rational basis for permitting the conversion of the clock from a mechanical to an electronic operating system (see Teachers Ins., [*20]82 NY2d at 41; Matter of Stahl York Ave. Co. LLC v City of New York, 76 AD3d at 295).
2. Error of law
In making the determination to issue a COA approving alteration, demolition or enhancement of an interior landmark, the LPC must consider the effects of the proposed work upon the protection, enhancement, perpetuation and use of the interior architectural features of that interior landmark that cause it to possess a special character or special historical or aesthetic interest or value (Administrative Code § 25-307[e]). An "interior architectural feature" is defined as "[t]he architectural style, design, general arrangement and components of an interior including, but not limited to, the kind, color and texture of the building material and the type and style of all windows, doors, lights, signs and other fixtures appurtenant to such interior" (Administrative Code § 25-302[l]). The LPC's jurisdiction extends not only to realty but also personalty (Teachers Ins., 82 NY2d at 45 [holding that fixtures such as metal railings, ceiling panels and hanging sculptures are interior architectural features subject to the LPC's jurisdiction]).
This case is distinguishable from Teachers, however. In Teachers, it was held that the LPC had jurisdiction over the preservation of various fixtures. Here, however, all of the elements of the original clock mechanism will be preserved. Accordingly, the issue at hand is not the LPC's authority with respect to the preservation of the original clock mechanism, but rather whether the statute empowers the LPC to direct the manner in which that mechanism is to be operated, an issue not before the Court in Teachers.
Administrative Code § 25-302 limits "interior architectural features" to the "style, design, general arrangement, and components of an interior[.]" In this case, while the § 25-302 statutory definition of "interior architectural features" applies to the style, design, arrangement or components of the clock mechanism, it does not include the actual operation of the mechanism. The LPC evidently came to this conclusion based upon its interpretation of what constitutes an "interior architectural feature" under § 25-302. As the question of what constitutes an "interior architectural feature" is a matter within the expertise of the LPC, and its interpretation of that term in this case is not unreasonable, this Court must give the LPC's interpretation deference (see Teachers Ins., 82 NY2d at 41-42). The matter of what elements of an interior space constitute style, design, arrangement or components of that space was clearly left by the legislature for determination by the LPC. Because the LPC, in the exercise of its experience and discretion, construed § 25-302 as not including the actual operation of the clock mechanism within the definition of "interior architectural feature," the LPC did not err in concluding that it had no authority to consider the effects of the proposed work on the clock's mechanical operation.
To the extent that, as the majority argues, the LPC relied on the advice of LPC's counsel in making this conclusion, the LPC counsel's advice was correct and the LPC did not err in relying upon it. The stated purposes of the Landmarks Law make clear that the LPC's authority is limited to preservation and protection of the physical features of a building and does not include the manner of their operation. Specifically, the Landmarks Law provides that "[t]he purpose of this chapter is to . . . effect and accomplish the protection, enhancement and perpetuation of . . . improvements" (Administrative Code § 25-301[b]). "Improvement" is defined as "[a]ny building, structure, place, work of art or other object constituting a physical betterment of real property, or any part of such betterment" (Administrative Code § 25-302[i]). Because the Landmarks Law's stated purposes are limited to protection of buildings, structures and other physical objects, were the LPC to order the continued operation of the clock mechanism, the LPC's action would be ultra vires (see Administrative Code § 25-301[b]). In any event, the Landmarks Law includes no clear and unambiguous language that compels the conclusion that the LPC can designate an operation and compel that the operation be continued. The majority's reliance on Administrative Law § 25-304(b) in arguing the contrary is misplaced, [*21]as that section empowers the LPC to impose regulations with respect to the overall "use" of a designated landmark but does not clearly and unambiguously confer upon the LPC the authority to regulate the operation of the interior architectural features of that landmark.
Based on the record, the most that can be concluded about the LPC's official position at the hearing is that while the LPC has some power to designate and regulate the operation of a landmark, it was not mandated here to find that the clock had to be maintained mechanically in perpetuity. Given the ambiguity of the statutes in this regard and the judicial deference due to the Commission's interpretation, I would conclude that the Commission's decision was not made based upon an error in law.
The majority argues that my conclusion that the LPC's determination was rational and unaffected by error of law is incorrect in light of testimony at the public hearing on the COA application that disconnecting the mechanism would put the clock mechanism "at risk" and, at worst, "destroy" it. Apart from the fact that this testimony was offered solely by one individual speaking on his own behalf and without explanation or record support for how disconnecting of the clock's original mechanism would put it "at risk," the majority's argument does not take into account that had the LPC taken any action to perpetuate the operation of the clock by means of that mechanism rather than disconnecting it, that action would have been ultra vires. In any event, this individual's single conclusory statement, provided without any factual basis, cannot retroactively render irrational the LPC's reliance on the overwhelming evidence reflecting that the clock operation will be preserved for current and future operation.
Furthermore, the propriety of the LPC's conclusion in this regard is unaltered by the aspirational comments of seven of its commissioners, which, as noted by the majority, were to the effect that they would have preferred that the mechanical operation of the clock be maintained. Had these commissioners believed that they had the authority to direct that mechanical operation of the clock be maintained, and that such operation was a practical and feasible option, they would have voted accordingly. In any event, to the extent that, as the majority maintains, the commissioners relied on the advice of the LPC's counsel that the LPC lacked the authority to require mechanical operation of the clock, their reliance was well placed, in that the counsel's advice was correct in that there in nothing in the Landmarks Law that grants the LPC any such authority. The majority cites no statutory or case law authority in support of the contrary view.
The validity of the LPC's conclusion is also unaffected by the majority's broad interpretation of the statutory language authorizing LPC to "apply or impose . . . regulations, limitations, determinations or conditions which are more restrictive than those prescribed or made by or pursuant to other provisions of law applicable to [the] . . . use [of a designated landmark]" (Administrative Code § 25-304[b]) to include the authority to require continued operation of the clock mechanism. Assuming that the language of § 25-304(b) is applicable to the LPC's determination in this regard, in permitting the conversion of operation of the clock to an electronic system, the LPC's action was consistent with that language, in that it "impose[d] . . . conditions . . . applicable to [the] use" of the clock.
Supreme Court erred in conflating the concept of protection and preservation of the components of the clock mechanism, which is within the purview of the LPC as established in the Landmarks Law, with the concept of maintaining the clock's mechanical operation, which is outside the scope of the LPC's statutory authority. Similarly, the majority erroneously conflates these two concepts by interpreting the language describing the scope of the LPC's designation of the clocktower area as an interior landmark as including "fixtures and interior components . . . including but not limited to, . . . clock machinery" to mean that the LPC's powers encompass both preservation of the physical clock mechanism and oversight of its operation. Thus, in issuing the COA permitting the building owner to take steps to preserve, to the extent feasible, [*22]the original clock mechanism intact without imposing any limitation on the manner in which the clock would be operated, the LPC acted within the scope of its authority under the Landmarks Law (see Administrative Code § 25-304[b]).
The majority argues that I ignore the fact that the landmark designation specifically refers to the mechanical operation of the clock as a protected feature. The landmark designation's references to protection of the "clock machinery" do not include maintaining the mechanical operation of the clock, however. While the landmark designation protects the physicality of the clock machinery, it does not specify that the machinery must remain operational. Put otherwise, "clock machinery" is not synonymous with "clock operation."
Therefore, the LPC's determination to approve work related to conversion of the clock from its original mechanical operating system to an electronic operating system was not based on an error of law.
Order and judgment (one paper), Supreme Court, New York County (Lynn R. Kotler, J.), entered May 17, 2016, affirmed, without costs.
Opinion by Gesmer, J. All concur except Tom and Kahn, JJ. who dissent in an Opinion by Kahn, J.
Acosta, P.J., Tom, Kapnick, Kahn, Gesmer, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: November 30, 2017
CLERK



Footnotes

Footnote 1:The room containing the spiral staircase is actually on the 13th floor of the building, and is so described in the designation of the building as a landmark. However, the parties, and the author of this article, refer to it as being on the 14th floor, consistent with American building convention.

Footnote 2:Mr. Schneider is a former New York City Human Resources Administration supervisor.

Footnote 3:Our colleague's conclusions that, as of 2015, the public had "long lacked access" to the clocktower, that it was only open for weekly guided tours before that, and that only a "limited number of people" could visit the upper three floors where the mechanism and clock faces are located are not supported by the record. 


Footnote 4:The hearing testimony of the developer's architect, quoted by our colleague, is at odds with Mr. Schneider's affidavit, in which he states that he visited the clocktower every week to wind and inspect the clock, until March 10, 2015, when he was denied access. It is not clear from the record when the last tour took place.


Footnote 5:Mr. Woodoff is a member of the Board of Directors of petitioner Save America's Clocks, a former staff member of the LPC from 1980 to 2000, and currently employed in the Historic Preservation Office of the City's Department of Design and Construction.

Footnote 6:In support of her argument that the Commissioners' comments reflect a determination that granting any level of public access to the clocktower would be impossible, our colleague quotes only a portion of the LPC Chair's statement characterizing it as a "constrained space." The Chair went on to clarify that the floors making up the clocktower "seem constrained as apartment spaces. They just don't seem like [they] lend themselves as a private apartment . . . we should have ability to regulate [anything happening within that space]. And I don't know that that necessarily lends itself for being privatized." Commissioner Washington, also quoted by our colleague, suggested that "[s]omething more than what [the developer] originally offered, is, I think, another way [of] looking at it. So that may be the public is at least people in the building or people who they invite. Say that they use that space for, you know, some gathering or some, you know, festival."

Footnote 7:Similarly, petitioner Christopher DeSantis stated in his affidavit to the article 78 court that disconnecting the clock from its mechanism would destroy the clock.

Footnote 8:Commissioner Bland did not speak during the hearing.

Footnote 9:Contrary to our dissenting colleague's characterizations, we hold neither that the "owner of an interior landmark is required to maintain public accessibility in perpetuity" nor that the LPC was "mandated here to find that the clock had to be maintained mechanically in perpetuity;" rather, we hold only that the LPC has the authority under the Landmarks Law and, in this case, pursuant to the deed's recitation of the Landmark designation, to reject a COA that would cause a designated interior to be totally inaccessible to the public, and to regulate the use of the clock mechanism.

Footnote 10:The Landmarks Law defines an "improvement" as "[a]ny building, structure, place, work of art or other object constituting a physical betterment of real property, or any part of such betterment" (Landmarks Law § 25-302[i]).

Footnote 11:In reaching the conclusion that the clock's mechanical operation "is outside the scope of the LPC's statutory authority," our colleague ignores the fact that the landmark designation, consistent with the accompanying Report, specifically refers to the mechanical operation of the clock as a protected feature. Furthermore, as discussed above, the City's appointment in 1992 of a Clock Master to care for the City's few remaining historic clocks underscores that the historical significance of these clocks derives "not only [from] the manner in which they were designed and decorated, but also because of the elegant complexity of their mechanical 'innards.'"


Footnote 12:Our colleague's claim that "the number of members of the public visiting the Clocktower Suite would have been very few" is thus beside the point. Indeed, this Court has previously noted that it "is the function of the Landmarks Preservation Commission to ensure the continued existence of those landmarks which lack the widespread appeal to preserve themselves" (Matter of Society for Ethical Culture in City of N.Y. v Spatt, 68 AD2d 112, 117 [1st Dept 1979], affd 51 NY2d 449 [1980]). Moreover, our colleague's claim has no support in the record.

Footnote 13: The LPC also approved the full restoration of the building's main lobby stair hall and banking hall.

Footnote 14: We recognize that, as the majority points out, installation of such facilities may not be required by the Americans With Disabilities Act, as the ADA requires removal of preexisting barriers to access only if "readily achievable" (42 USC § 12182[b][2][A][iv]) and such measures are deemed not "readily achievable" if they "would threaten or destroy the historic significance of a building" (Department of Justice Technical Assistance Manual § III-4.4200). The majority points to no proof, however, that installation of elevators would not be readily achievable. Assuming that such installation would be readily achievable, it would be required by the ADA and would still impose a burden on the owner of the building in terms of time and expense.

Footnote 15: For example, the interior floor area on the 15th floor, which houses the clock pendulum mechanism, measures approximately 17 feet by 17 feet, including the space occupied by the pendulum enclosure and the spiral staircase.

Footnote 16: Currently, there is only one mechanic in the City who appears qualified and available to maintain the mechanical operation of the clock.