# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 17
In the Matter of Save America's Clocks, Inc.,
et al.,
          Respondents,
     v.
City of New York, &c., et al.,
          Appellants.

Diana Lawless, for appellants City of New York, et al.
James P. Rouhandeh, for appellant Civic Center Community Group Broadway LLC.
Michael S. Hiller, for respondents.
City Club of New York, et al., amici curiae.

GARCIA, J.:

New York City's Landmarks Preservation Commission (LPC) is entrusted with the "establishment and regulation" of the City's landmarks (NYC Charter § 3020 [6]). On respondents' appeal in this CPLR article 78 proceeding, petitioners allege that the LPC's decision to approve the redevelopment of 346 Broadway—a historic building in Lower

- 1 -

Manhattan that the LPC previously designated as a landmark —was irrational and affected by errors of law.[1] We disagree and hold that the LPC's decision was proper. Accordingly, we reverse.

I.

The Landmarks Preservation Law (Landmarks Law) was passed in 1965 as a response "to the loss of a number of [New York City's] significant buildings" (Teachers Ins. & Annuity Assn of Am. v City of New York, 82 NY2d 35, 41 [1993]). The law is "not" designed for public "acquisitions of historic properties"; rather it "provid[es] services, standards, controls and incentives that will encourage preservation by private owners and users" (Penn Cent. Transp. Co. v City of New York, 438 US 104, 110 [1978]). In 1973, the law was amended to allow the LPC to designate an interior landmark, defined as "[a]n interior, or part thereof, any part of which is thirty years old or older, and which is customarily open or accessible to the public, or to which the public is customarily invited, and which has a special historical or aesthetic interest or value" (Administrative Code of City of NY § 25-302 [m]).

---

[1] Petitioners include the following entities and individuals: Save America's Clocks, Inc., The Historic Districts Council, Inc., Tribeca Trust, Inc., Marvin Schneider, Forest Markowitz, Thomas Bernardin, Christopher DeSantis, Jeremy Woodoff, and Alanna Heiss. Respondents include the following municipal and private entities: the Deputy Mayor for Housing and Economic Development for the City of New York, the LPC, the DOB, and the developer. Other entities associated with the developer were named as Respondents, including The Peebles Corporation, 346 Broadway LLC, El Ad US Holding, Inc., El Ad 346 Development LLC, and Beyer Blinder Bell, Architects and Planners, LLP.

"The primary responsibility for administering the law is vested in the [LPC]" (Penn Cent, 438 US at 110). The Landmarks Law allows the LPC—whose 11 Commissioners are appointed by the Mayor—to designate landmarks "[f]or the purpose of . . . furthering the protection, preservation, enhancement, perpetuation and use" of such landmarks (Administrative Code § 25-303 [a]). The LPC's authority over landmarks does not end with designation. Express "authoriz[ation]" from the LPC is required before "work" begins on a "landmark site" or a structure "containing an interior landmark" (Administrative Code § 25-305 [a] [1]). The LPC's approval may come in one of two forms. It may issue a "certificate of no effect" if the "proposed work" does not "change, destroy or affect any exterior architectural feature . . . or any interior architectural feature" of a landmark (Administrative Code § 25-306). Such "feature[s]" are defined broadly to include "[t]he architectural style, design, general arrangement and components" of a protected interior or exterior (Administrative Code § 25-302 [g], [l]).

If an "application" does, however, seek to "alter" or "demolish" a landmark, the LPC must issue a "certificate of appropriateness" (COA) before the "proposed work" can begin (Administrative Code § 25-307). By statute, it is for the LPC to "determine whether the proposed work would be appropriate for and consistent with the effectuation of the purposes" of the Landmarks Law (id.). LPC's discretion is broad given the Landmark Law's diverse statutory purposes, which range from the "protection, enhancement and perpetuation" of landmarks to "strengthen[ing] the economy of the city" (Administrative Code § 25-301 [b]). Unlike initial landmark designations, the LPC's COA determinations

are not reviewable by the City Council (compare Administrative Code § 25-303 [g] [2] with Administrative Code § 25-307). If a COA is denied by the LPC, the applicant "may submit . . . [a] modified plan for approval," or "seek[] a certificate of appropriateness on the ground of 'insufficient return'"—a procedure designed "to ensure that designation does not cause economic hardship" (Penn Cent., 438 US at 112).

## II.

346 Broadway is the old New York Life Insurance Company headquarters. The fifteen-story structure, completed in the late 1890s, was designed in part by the historically significant architectural firm of McKim, Mead & White. The City acquired the building in 1968, and it was during this period of City ownership, in 1987, that the LPC designated the Building and parts of its interior as landmarks.

In its initial designation report, the LPC noted several of the building's unique features. The exterior of the "palazzo-like tower," constructed in "the neo-Italian Renaissance style," was largely built with "white Tuckahoe marble." The "interiors" were also "designed using the finest craftmanship and lavish materials" including "marble, bronze, [and] mahogany." Among the interior spaces designated were the former "Banking Hall," a "grand and boldly scaled neo-Classical room" with "monumental freestanding Corinthian columns, and "[t]he clock tower" which housed a "No. 4 Striking Tower Clock"—a mechanical clock driven "by a thousand pound weight" which "strikes the hours" with a hammer and a "5000 pound bell." The clock was manufactured by E. Howard Watch & Clock Company and "was specially equipped with a double three-legged

gravity escapement"—a feature, petitioners claim, is shared by only one other tower clock: the clock housed by Elizabeth Tower (also home to the bell known as Big Ben) in London. In total, the LPC landmarked 20,000 square feet out of the building's total interior space of 420,000 square feet.

In December 2013, the City sold the building to Civic Center Community Group Broadway LLC, a private developer. After purchasing the Building, the developer sought approval from the New York City Department of Buildings (DOB) to convert the building into private residences. The developer's plan was approved by DOB in June 2014. In line with the Landmarks Law, the developer next sought a COA from the LPC.

The developer's initial proposal, presented to the LPC at a public hearing in November 2014, included installation of new windows, removal of an outdated fire escape, restoration of entrances to the building, addition of a new entrance, removal of a deteriorating parapet that had been surrounded by scaffolding for ten years, and addition of a fence and gate inspired by similar structures designed for other sites by the original architectural firm. With respect to the interior, the owner proposed to, among other things, restore the main lobby and the banking hall and restore and relocate the president's office. The clock tower mechanism would be kept in its original location and the building and area around it restored and weatherproofed. Under the proposal, the banking hall and lobby would remain publicly accessible. Questions were raised, however, about access to the clocktower, which was to be part of a private residence, as well as about the continued operation of the clock. During the hearing, LPC's General Counsel stated that "there's no

power under the Landmarks Law to require interior-designated spaces to remain public."

Counsel also opined that the Commission was powerless to require that the clock

mechanism remain "operable," but noted that the developer intended to keep the clock

running electrically.

After the public hearing, certain Commissioners and LPC staff members conducted

a site visit.  Shortly after that, at a second public meeting in December 2014, the

Commission approved the proposal by a vote of 7-1.  The dissenting commissioner voted

against the proposal because she "[could] not approve the changes to the [clock]

mechanism itself and to the interior of the clock tower gallery, as well as mechanical

room."

Consistent with the Landmarks Law, the COA "set forth the reasons for [the LPC's

determination]" in detail over seven single-spaced pages (Administrative Code § 25-315).

As articulated in the COA, the LPC found that the developer's plan would have "the main

lobby, stair hall, clock tower rooms and banking hall . . . fully restored."  Additionally, it

would "allow accessibility by the public to the lobby and former banking hall."  The LPC

also found that "the clock mechanism and faces will be retained, thereby preserving these

significant features."  In sum, the LPC found that "the proposed restorative work will return

. . . the interior closer to [its] original appearance, and will aid in [its] long-term

preservation."

III.

This proceeding challenging the COA ensued.  Petitioners—a self-styled coalition of entities and individuals—agreed to "limit the scope of . . . litigation only to issues pertaining to the Clocktower Suite," specifically the decisions to limit public access to the clock tower and to run the clock electrically.  Supreme Court granted the petition and annulled the COA.  The Court concluded that decision to "eliminate public access to the clock tower" was "irrational and arbitrary," but that there was a rational basis for the conversion of the clock from mechanical to electrical operation.  Nevertheless, the Court determined that the decision to electrify the clock was affected by an error of law because LPC Counsel's advice that the LPC could not regulate the functioning of the clock was incorrect.  Similarly, LPC Counsel's advice on public access was wrong, according to the court, because "the general provisions of the Landmarks Law vest the Commission with the power to regulate an interior landmark."

A divided Appellate Division affirmed (157 AD3d 133 [1st Dept 2017]).  The majority agreed with Supreme Court that the decision to discontinue public access to the clock tower was irrational because "it is inconsistent with the statutory definition" of interior landmark, but parted ways with Supreme Court by finding the decision to electrify the clock irrational as well.  The majority also agreed with Supreme Court that LPC's General Counsel gave incorrect advice during the public hearings about the LPC's authority to require public access and dictate how the clock functioned.  That advice, the majority found, affected the Commission's vote on the COA—a determination the majority

based on portions of the hearing transcript.  The dissent concluded that based on the record, the LPC's decisions were rational, and that no error of law infected the proceedings because: (1) counsel's advice was correct; and (2) the LPC vote would not have been affected even if the advice was incorrect (157 AD3d at 153 [Kahn, J., dissenting]).

Respondents appealed as of right to this Court (see CPLR 5601[a]).

IV.

Judicial review of the Commission's findings is limited to whether "the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]; see Lutheran Church in Am. v City of New York, 35 NY2d 121, 128, n 2 [1974] [explaining that the "public hearing provided for in the Landmarks Law is not the sort of adversary hearing involving cross-examination and the making of a record as is contemplated under CPLR 7803 (4), where substantial evidence is the test set forth"]).  "This review is deferential for it is not the role of the courts to weigh the desirability of any action or choose among alternatives" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 430 [2017] [internal quotation marks and citation omitted]; see Matter of Beck-Nichols v Bianco, 20 NY3d 540, 559 [2013] [the "standard is, of course, an extremely deferential one"]). "[T]he courts cannot interfere unless there is no rational basis for the exercise of discretion" or "the action is without sound basis in reason . . . and taken without regard to the facts" (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; see

Matter of Society for Ethical Culture in City of N.Y. v Spatt, 68 AD2d 112, 116 [1st Dept 1979] ["our inquiry is directed to a determination of whether the commission's (decision) had a rational basis or, if, . . . it was arbitrary and capricious"]).  It follows that "[i]f the court finds that the determination is supported by a rational basis, it must sustain the determination even if the court concludes that it would have reached a different result than the one reached by the agency" (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]).

A.

The COA described the approved proposal, including as it related to the clock tower and clock mechanism, and found that, under the proposal, "the main lobby, stair hall, clock tower rooms and banking hall w[ould] be fully restored, and the clock mechanism and faces w[ould] be retained, thereby preserving these significant features."  The COA explains that "[b]ased on these findings, the LPC determined the work to be appropriate to [the building] and [the] [i]nterior [l]andmark[s] and voted to approve it."  The LPC made its determination and these findings following an extensive deliberative process, including multiple public hearings.  The LPC "afford[ed] a reasonable opportunity for the presentation of facts and the expression of views by those desiring to be heard" and, in an exercise of its discretion, received "testimony of witnesses," along with various documentary submissions (Administrative Code § 25-313 [b]). The LPC staff engaged in a dialogue with the owner concerning the project and staff members visited the building site, along with certain Commissioners, to more fully understand the scope of the proposed work and its potential impact on the designated interior landmarks.

Petitioners argue that the LPC's decision to close off the clocktower is inconsistent with the statutory definition of interior landmark and is therefore facially irrational. It is the LPC's position that "public access is a threshold condition, not an ongoing one," and "public access at designation is no more than the foothold that allows the the Commission to exercise the police power to regulate private property." This is consistent with our holding in Teachers. There, we said public access is a "jurisdictional predicate" for an initial LPC designation (82 NY2d at 44). A designation, we noted, did not foreclose the possibility of "private use in the future" (Teachers, 82 NY2d at 44). Underscoring this, the law contemplates that the LPC may issue a COA for "demol[ition] of any improvement"—which is defined to include "building"—"containing an interior landmark" (Administrative Code §§ 25-302 [k]; 25-307 [a]). As the LPC notes, the COA "process *presumes* change, sometimes dramatic change." At base, the Landmarks Law makes plain that the LPC's decision with respect to the clock tower was well within the ambit of its discretion.

Contrary to petitioners' claims, the LPC's decision to allow the clock to be electrified was similarly rational. As the dissenting opinion in the Appellate Division noted, "the operation of the clock would be modernized by electrification, thereby assuring its continued maintenance for the foreseeable future, and the visibility of exterior clock faces to the public would be enhanced by LED or some other form of modernized lighting, while the clock faces would remain in their original, pristine condition" (157 AD3d at 166 [Kahn, J, dissenting]). The COA also makes plain the LPC's finding that the developer's

plan would ensure that "the clock mechanism and faces will be retained, thereby preserving these significant features." The LPC was well within its discretion to approve a plan that included electrification of the clock.

The LPC's determination to issue the COA following this extensive and inclusive deliberative process, and to approve certain work to the clock tower and clock mechanism on the basis that the proposed work would restore the clock tower rooms and both retain and preserve the interior and exterior features of the clock mechanism and faces, constituted a rational exercise of the LPC's discretion based on its unique expertise. Certainly, those determinations are consistent with the purposes of the Landmarks Law (see Administrative Code § 25-307 [a] [requiring the Commission to "determine whether the proposed work would be appropriate for and consistent with the effectuation of the purposes of" the Landmarks Law, and mandating that, if this question is answered in the affirmative, the Commission "shall grant a certificate of appropriateness"]; Administrative Code § 25-301 [b] [stating that the express purpose of the Landmarks Law is to, among other things, "effect and accomplish the protection, enhancement and perpetuation of . . . (landmarks) which represent or reflect elements of the city's cultural, social, economic, political and architectural history," and "safeguard the city's historic, aesthetic and cultural heritage"]). Moreover, in approving a project that would restore the clock tower and ensure the clock's continued operation along with the preservation of its components, it is manifest that the Commission "consider[ed] the effects of the proposed work upon the protection, enhancement, perpetuation and use of the interior architectural features of such interior

landmark which cause it to possess a special character of special historical or aesthetic interest or value" (Administrative Code § 25-307 [e]).

In short, it cannot be said that the Commission acted with "no rational basis" (Matter of Pell, 34 NY at 231), and the Appellate Division erred in concluding otherwise.

B.

We also conclude that the LPC's decisions were not affected by an error of law. Petitioners rely solely on statements concerning the LPC's authority found in the transcript of the public hearings. "It is the settled rule," however, "that judicial review of an administrative determination is limited to the grounds invoked by the agency" (Matter of Scherbyn v Wayne-Finger Lakes Bd. of Co-op Educ Servs, 77 NY2d 753, 758 [1991]). Here, the Landmarks Law makes plain that the COA must "set forth the reasons" for the LPC's action (Administrative Code § 25-315). And the COA in this case did exactly that by setting forth in detail why the LPC "determined the work to be appropriate." There is no need to "surmise or speculate as to how or why [the LPC] reached a particular conclusion" (Montauk Imp, Inc v Proccacino, 41 NY2d 913, 914 [1977]). The Landmarks Law gives the LPC the authority to "grant" a COA or "deny" one after it evaluates the "proposed work" (Administrative Code § 25-307). The LPC appropriately exercised that authority in this case.

V.

At bottom, the Landmarks Law invests the LPC with broad discretion. The law "textually . . . commit[s]" a "policy" decision—determining whether an individual project "is appropriate for and consistent with the effectuation of the purposes of" the Landmarks Law (Administrative Code § 25-307 [a])—to the LPC alone (<u>Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo</u>, 64 NY2d 233, 240 [1984]). Because of this "very wide discretion" we do not "have the power to substitute [our] judgment in place of the judgment of the properly delegated administrative officials" (<u>Matter of Marburg v Cole</u>, 286 NY 202, 208 [1941]).

Based on the foregoing, the order of the Appellate Division should be reversed, with costs, and the proceeding dismissed.

Matter of Save America's Clocks v City of New York

No. 17

RIVERA, J. (dissenting):

New York City is an architectural wonder; home to hundreds of landmarked structures and areas with unique cultural and historical value to the public. Some structures illustrate the grandeur and majesty of the City—Grand Central Terminal, the Empire State

Building, the Chrysler Building, and the Brooklyn Bridge. Others depict the City's vibrant

social and cultural life—the Coney Island Cyclone, the Rainbow Room in Rockefeller

Center, the Apollo Theatre in Harlem, and the Paradise Theatre in the Bronx. Some are

visible to the public from the street and fully appreciated in contrast to their surroundings,

like the Sidewalk Clock at 161-11 Jamaica Avenue; others, like the Sailors' Snug Harbor

on Staten Island, provide a more intimate view of life and invite us to enjoy the internal

settings of the past. Varying in size, fame, and use, these structures and spaces root the

City in its complex and diverse history and embody its indelible soul.

The New York City Landmarks Preservation Commission ("LPC") is authorized to

designate these structures for preservation in furtherance of the City's Landmarks

Preservation and Historic Districts Law ("Landmarks Preservation Law") (Administrative

Code § 25-301 et seq.; NYC Charter § 3020 [6]).[1] In order to effectuate the Law's

conservancy purposes, the LPC must approve only those changes and alterations that do

not imperil the integrity of a designated structure (Administrative Code § 25-305 [a] [1]).

Here, we must determine whether the LPC exceeded its authority when it approved a

developer's proposal to alter and privatize one of the last functioning mechanical public

clocks in the City. Far from an ordinary clock, this is a centuries old timepiece, that sits

---

[1] I refer to the Landmarks Preservation and Historic Districts Law as the "Landmarks Preservation Law" to accurately reflect the statute's purpose, which is to protect and preserve the exteriors, interiors, scenic landscapes, and districts that are landmarked by the LPC.

atop one of the City's first skyscrapers and is driven by a rare mechanism that exists in just a few other clocks in the world.

Notwithstanding the historical significance of the clock to the City, the LPC approved the building owner's request to convert this interior landmark into a luxury apartment. The former is a rare horological masterpiece; the latter is a typical, now-commonplace, development for the wealthy by the wealthy. Although the LPC has great latitude to decide whether to approve an alteration to an interior landmark, it cannot approve an alteration that, by its very nature, amounts to a de facto rescission of a landmark designation. So, the question is, when is an interior landmark no longer an interior landmark? The answer is contained in the plain language of the Landmarks Preservation Law, which defines an interior landmark as accessible to the public for the people's benefit and welfare. Transforming an interior landmark into a private residence such that it is completely closed off from the public, annuls its designation and is inconsistent with the purpose of the Landmarks Preservation Law.

I.

New York City's Landmarks Preservation Law

The City Council first enacted the Landmarks Preservation Law in 1965 to preserve the City's "historical and architectural heritage" (id. § 25-301). The statute was, in part, a response to the public's dismay of the destruction of Pennsylvania Station, a Beaux Arts-Style railway station that was demolished to construct Madison Square Garden (John Nivala, The Future of Our Past: Preserving Landmark Preservation, 5 NYU Envtl L J 83,

83–85 [1996]).  However, more than sentimentality animates the City's commitment to preserving symbols of the past.  Historic preservation laws serve a pragmatic interest in the public welfare.   As the United States Supreme Court explained, the Landmarks Preservation Law is part of "nationwide legislative efforts" to use "historic conservation" to address "one aspect of the much larger problem, basically an environmental one, of enhancing—or perhaps developing for the first time—the quality of life for people" (Penn Cent. Transp. Co. v City of New York, 438 US 104, 108 [1976], quoting Frank Gilbert, Precedents for the Future, 36 Law & Contemp. Prob. 311, 312 [1971]).  It is understood as reflecting the "widely shared belief that structures with special historic, cultural, or architectural significance enhance the quality of life for all," not merely the few (id.; see Administrative Code § 25-301 [b]).

New York City's Landmarks Preservation Law expressly guards against the loss of cultural assets vital to the City's world stature and economy, for the benefit of the general public, not any individual interest.  As detailed in the statute's purpose and public policy declaration, the City Council—the City's governing body—recognized that many sites of "a special character or a special historic or aesthetic interest or value" had been "uprooted . . . without adequate consideration of the irreplaceable loss to the people of the city of the aesthetic, cultural and historic values represented" in these structures (Administrative Code § 25-301 [a]).  The Council acknowledged that the "standing of the city as a world wide tourist center and world capital of business, culture and government cannot be maintained

or enhanced by disregarding the historical and architectural heritage of the city and by countenancing the destruction of such cultural assets" (id.).

Based on these findings, the Council "declared as a matter of public policy that the protection, enhancement, perpetuation and use of improvements . . . of special character or special historical aesthetic interest or value is a public necessity and is required in the interests of the health, prosperity, safety and welfare of the people" (id.). The express purpose of the Landmarks Preservation Law is to protect the spaces that represent the City's "historic, cultural, and aesthetic history"; enhance the City's economy; foster civic pride in the City's past accomplishments; and "promote the use of historic districts, landmarks, interior landmarks and scenic landmarks for the education, pleasure and welfare of the people of the city" (id. § 25-301 [b]). As the City Council and the United States Supreme Court have recognized, landmark designation economically benefits both the municipality and the owner, as it enhances the City's stature and quality of life.

The Landmarks Preservation Law adopts a designation framework for the preservation of historically and culturally significant sites and districts. Since 1973, the Landmarks Preservation Law has protected interior landmarks, defined as:

> "An interior, or part thereof, any part of which is thirty years old or older, and which is customarily open or accessible to the public, or to which the public is customarily invited, and which has a special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation, and which has been designated as an interior landmark pursuant to the provisions of this chapter" (Administrative Code § 25-302 [m]).

An interior architectural feature is "[t]he architectural style, design, general arrangement and components of an interior, including, but not limited to, the kind, color and texture of the building material and the type and style of all windows, doors, lights, signs and other fixtures appurtenant to such interior" (id. § 25-302 [l]).

Landmark designation is a rigorous process, involving the LPC, City Council, mayor, various administrative agencies, and local communities. The LPC is responsible for initially designating landmarks through a public hearing process that provides a reasonable opportunity for the public to present facts and views on the proposed landmark (id. §§ 25-303[b]; 25-313 [b]). Notice of the hearing must be given to the City Planning Commission, affected community boards, the president of the borough where the landmark is located, and the owner of the landmark (id. § 25-303 [a], [j]). If the LPC adopts the proposal to designate a landmark, it must then file the designation with the City Council, Department of Buildings, City Planning Commission, Board of Standards and Appeals, Fire Department and Department of Health and Mental Hygiene (id. § 25-303 [e], [f]). The City Planning Commission also must hold a public hearing on the designation and submit a report to the Council outlining the impact of the designation (id. § 25-303 [g] [1]). The City Council then issues its final vote on the designation, which is subject to the mayor's veto (id. § 25-303 [g] [2]). Likewise, the LPC has the authority to rescind a landmark designation but may only do so after notice and public hearings and approval from the City Council and mayor (id. § 25-303 [h]).

Once designated, a landmarked site may not be altered without the LPC's approval. An owner who desires to "construct, reconstruct, alter or demolish any improvement on a landmark . . . or containing an interior landmark" must file an application for a certificate of appropriateness (id. § 25-307 [a]). Upon submission of a request for such certificate, "the [LPC] shall determine whether the proposed work would be appropriate for and consistent with the effectuation of the purposes of [the Landmarks Preservation Law]" (id.). If the LPC determines that the proposed work furthers the statute's purposes, then the LPC "shall grant" the certificate (id.). If it determines to the contrary, "it shall deny the applicant's request" (id.). While an applicant can modify its proposal to address concerns raised during this process, the LPC cannot approve actions in contravention of the statutory purposes and public policy of the Landmarks Preservation Law. In other words, the LPC has no discretion other than in its determination as to whether the proposed work is appropriate; it is wholly without power to grant a request that does not satisfy the criteria set forth in the Landmarks Preservation Law or to deny a request that does. The Council has further cabined the LPC's decision-making authority by requiring that the LPC "consider the effects of the proposed work upon the protection, enhancement, perpetuation and use of" the exterior and interior architectural features "which cause it to possess a special character or special historical or aesthetic interest or value" (id. § 25-307 [d], [e]).

Significantly, and in line with the legislative intent to protect and preserve landmarks for future use and enjoyment by the public, an owner may request permission to demolish a designated landmark in whole or in part under limited circumstances. For

instance, under the Law's hardship provision, an owner may assert that work is necessary for the building to provide a "reasonable return" (id. § 25-309).

II.

The Interior Landmark Clock

New York City is home to the former New York Life Insurance Company building, located at 346 Broadway in the borough of Manhattan. Constructed in 1898, the building was part of the first wave of skyscrapers that heralded the dawn of the twentieth century (Cromwell Childe, New York's High Buildings, NY Times, Feb 6, 1898 [discussing the novel appearance of skyscrapers, "(i)n the place of the old(,) the new looms—forever skyward"]). Designed by the renowned architectural firm McKim, Meade & White, which would later build Pennsylvania Station, and with construction costs that were expected to exceed $1.5 million, the building was described as "one of the most striking projected improvements" in lower Manhattan (For A Modern Building. The New-York Life Insurance Company's New Home, NY Herald-Tribune, Aug 29, 1895). Its planning and assembly were noteworthy and garnered significant public attention (see In the Real Estate Field: Plans for an Addition to the New-York Life Building and for a Theatre, NY Times, Dec 27, 1895 [noting the filing of plans with the City's building department]; Race Between Buildings: Interesting Contest In Which Sky Scrapers Take Part, NY Times, Oct 18, 1896 [describing a "race" to construct the building before completion of the nearby Central National Bank Building]).

The building stands 13 stories and encompasses an entire block, bounded by Broadway, Leonard Street, Lafayette Street, and Catherine Lane, in what was once referred to as the "mercantile section" or "dry-goods district" of Manhattan (New York Life Insurance Company, A Temple of Humanity 5 [1909]).  As the LPC describes in its designation report, the exterior is made of white Tuckahoe marble in the neo-Italian Renaissance style, with a "monumental portico entrance," attractive cornices, and a decorative balustrade at the fourth floor.  At the top of the 13th floor of the Broadway face of the building is a parapet with four impressive stone eagles, above which, rises a clocktower topped by a statute.  The interior of the building reflects a similar sense of majesty, with a long hall on the first floor that spans the length of the building, composed of terrazzo floors and marble walls.  One end of the hall, the "Banking Hall," stands two stories tall and has large round-arched windows, two rows of Corinthian columns, and a deeply coffered ceiling.

The building's clocktower is impressive both for its external magnificence and internal architectural and mechanical features (Ernest H. Morgan, Clocks, Clock-Making, and Clock-Makers, 60 The Journal of Education 225, 225 [1904] [noting the "enormous four-dial clock is one of the sights of the metropolis"]).  As the LPC's designation report describes, the four large faces of the clock are visible from the street and accented by a statue of "four-kneeling men supporting a skeletal globe surmounted by an eagle."  An 1898 New York Times article describing the upper stories of the City's significant buildings such as the Mutual Life Building and American Tract Society Building—the

newly termed skyscrapers—saw fit to include the clocktower (Childe, New York's High Buildings).  The author highlighted its aesthetic elements:

> "The clock here and the tower itself are modern ornaments of Broadway.  From the point mentioned they are superb.  The eagles with outstretched wings marking the tower's base, the heroic figures of an Atlas type holding the globe on their back, all carved out of fine white stone, are the features that at once strike the eye and that the man in the street can only dimly see.  The tower's base on the rook is balconied. The tower itself is square at its foot, and then runs up in the rounding form of a watchtower of old" (id.).

The clock was manufactured by the E. Howard Watch & Clock Company and operates with a particularly rare double three-legged gravity escapement that is manually wound once a week.  The mechanism was once praised as "the best time-keeping system used in buildings in the world" (Morgan at 225).  Petitioners explain that only one other tower clock possesses such a mechanism: "Big Ben," the clock at the northern end of the Houses of Parliament in Westminster Palace, London.[2]  The clock mechanism is driven by a 1,000-pound weight and operates with a 5,000-pound bell, twice the size of the Liberty Bell, that was designed to toll the hour with the assistance of two 800-pound hammers.

In 1968, the City acquired the building.  In 1987, the LPC designated the building's exterior and parts of its interior as landmarks.  The LPC's interior designation report

---

[2] Edmund Beckett Denison was appointed to design Big Ben, and in doing so, invented the revolutionary double three-legged gravity escapement (Building the Great Clock, parliament.uk, https://www.parliament.uk/about/living-heritage/building/palace/big-ben/building-clock-tower/building-great-clock/).  Completed in 1859, Big Ben is now a UNESCO World Heritage Site, and is "instantly recognizable" (Palace of Westminster and Westminster Abbey including Saint Margaret's Church, UNESCO, http://whc.unesco.org/en/list/426).

highlights various aspects of the building that give it special aesthetic and cultural value, including the clock and clocktower. The report notes that the "clock and clocktower interior, which have not been altered, are a rarity in New York City." It describes features of the clock mechanism as well: its manufacture by the E. Howard Watch & Clock Company, its 1,000-pound weight, and its need to be wound on a weekly basis. In particular, the report emphasizes the functioning mechanism's import, stating "[t]he clock is one of the few remaining in New York which has not been electrified."

The designation concludes:

> "[a]ccordingly, pursuant to the provisions of [the Landmarks Preservation Law], the Landmarks Preservation Commission designates as an Interior Landmark the . . . thirteenth floor interior . . . ; fourteenth floor interior consisting of the clocktower machinery room; . . . and the fixtures and interior components of these spaces, including but not limited to . . . clock machinery"

Years later, recognizing that the clock mechanism needed regular maintenance, the LPC urged the City to appoint a City Clock Master. The LPC called the six remaining mechanical public clocks in the City "public treasures," that "are not simply decorative elements on distinguished buildings, [but] truly urban amenities." The mayor agreed and stated at the appointment ceremony of the Clock Master of the City of New York that the clocks were "works of art," with extraordinary designs and "mechanical 'innards.'" The mayor further acknowledged "[i]t is crucial that we carefully preserve and safeguard our City's architectural heritage and [that] the large mechanical clocks are an especially public and important part of that heritage." For 35 years, the clock in the former New York Life

Insurance Company building worked without disruption; the Clock Master, Marvin Schneider, wound and maintained the clock, giving weekly public tours of the clocktower.

In 2013, the City sold the building to respondent, Civic Center Community Group Broadway LLC ("Developer"), for $145 million. At the time of the transfer, the deed expressly stated that the purchase was subject to "Notice of Landmark Designation, recorded May 25, 1989." Developer thus knowingly purchased more than a building with an artistic interior; it bought a historically significant structure, protected by law and intended to be preserved for public enjoyment. Indeed, Developer and its partner now seek to capitalize on the designation by advertising the building as a "Renaissance-Revival palace," whose exterior and interiors were "designated as New York City landmarks" and will soon house luxury condominium residences and possibly a boutique hotel (The Peebles Corporation, 108 Leonard Street, http://peeblescorp.com/project/108-leonard-street [last visited March 18, 2019]).

Approximately 10 months later, Developer applied for a certificate of appropriateness with a 103-page proposal. Developer had acquired the necessary Department of Building permits and sought the LPC's approval to restore the exterior and interior of the building. Developer planned to replace much of the exterior with new fixtures in the style of the original architecture, renovate the Banking Hall, and convert the rest of the building into residential properties.

As relevant to this appeal, the proposed alterations to the clock were the topic of heated debate at two public hearings LPC held in 2014. At the first hearing, Developer

made clear that the clocktower, with its unique clock mechanism, would be sold as part of the private triplex apartment that would occupy the top floors of the building, rendering the clock inaccessible to the public. When asked whether it would be feasible to allow the public to access the clock mechanism from the roof, the Developer's architect stated, "it is possible, but it is not our intention to do that." During this exchange, counsel for the LPC interjected: "there's no power under the Landmarks [Preservation] Law to require interior-designated spaces to remain public." When the discussion turned to the operation of the clock, Developer did not state whether the clock would continue to run with the original mechanism. However, counsel for the LPC advised "there's nothing in the Landmarks [Preservation] Law that requires or gives the Commission the power to require that this mechanism remains operable."

During the first hearing, the LPC also heard from members of community groups, preservation societies, and Clock Master Schneider, who all expressed concern that the clocktower would no longer be accessible to the public and that the mechanism would not function. Schneider also stated that the 1987 designation was intended to preserve the clock's mechanism and that disconnecting it would fundamentally alter the clock as a whole.

After a visit to the site, the LPC held a second public hearing one month later. There, Developer explained that it would disconnect the mechanism, electrify the clock, and weatherproof the part of the clocktower that housed the mechanism. While Developer's architect did not know all the details of the electrification process, he surmised that the

mechanism would "be available at any time for anybody to look at or come back in some day and wind it up, who knows." Developer made clear, however, that the reason the mechanism would be disconnected was to ensure the privacy of the future owners of the triplex. Although there were questions from several commissioners regarding the LPC's authority to require public access and the maintenance of the original mechanism, LPC counsel repeated his opinion that the LPC was without authority to regulate the functioning of the clock or to require public access. The LPC Chair echoed counsel's position, stating that the "law does not require, again, that it remain open to the public and used." At the end of the hearing, the LPC voted to issue the certificate of appropriateness with one commissioner dissenting.

The certificate approved work that would renovate the exterior of the building and the Banking Hall. It also approved work that Developer had not initially proposed, which would involve "disconnecting, retaining, and protecting the existing clock mechanism and the restoration of the wood and glass mechanism enclosure; and electrifying the clock operation." In a single sentence, the LPC reasoned that such work will "fully restore[]" the clocktower and will ensure that the "clock mechanism and faces will be retained, thereby preserving these significant features."

III.

<u>The LPC Decision to Approve the Clock's Privatization and Alteration</u>

Save America's Clocks, a national horological preservation organization; the Historic District Council; Tribeca Trust; and other individuals involved in the preservation

of the clock successfully challenged the LPC's approval of the certificate in the courts below. The majority now reverses, concluding that the LPC's decision was rational. I disagree, first, because the LPC permitted Developer to transform the clocktower, an interior landmark, from a publicly accessible space to a private luxury residence in contravention of the plain language of the Landmarks Preservation Law. The LPC's decision effectively rescinds the clock's landmark designation, an act which may only be accomplished by holding a public hearing, proposing rescission to the City Planning Commission, and obtaining approval of the rescission from the City Council and mayor. Second, the decision contravenes the LPC's statutory mandate to permit only those alterations that effectuate the purposes of the Landmarks Preservation Law. Such alterations do not include the conversion of a public treasure to a private apartment in a manner that irrevocably damages the unique and defining historic characteristic of the interior landmark.

In reviewing the LPC's decision, this Court must determine whether it "was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]). An agency's action is arbitrary and capricious where it lacks a rational basis and is taken without regard to the facts (Matter of Pell v Board of Educ. of Union Free School Dist., 34 NY2d 222, 231 [1974]). An agency decision in excess of its authority is ultra vires, infected by an error of law, and cannot stand (see CPLR 7803; Matter of DeVera v Elia, 32 NY3d 423 [2018]).

By approving alterations that rendered the clock mechanism inaccessible to the public, the LPC effectively rescinded the clock's designation. Public access is an essential characteristic of an interior landmark (Administrative Code § 25-303 [m]). Nothing in the statute requires unlimited round-the-clock access, but the opportunity for the public to view those features that warrant landmark designation is fundamental to the statute's purposes. Indeed, the Landmarks Preservation Law was enacted because the destruction of historic sites wrought "irreparable loss to the people of the city," and damaged the City's position as a destination for visitors and tourists (id. § 25-301 [a]).

That an interior landmark's designation requires some degree of public accessibility is evident from the language of the Landmarks Preservation Law. We begin with the well-established rules of construction that we may not interpret a statute in contravention of its plain language or in a manner that leads to incongruous results (McKinney's Statutes § 94). The Landmarks Preservation Law's definition of an interior landmark must apply throughout the life of the designated site—otherwise it is not an interior landmark. The statute defines an interior landmark in the present, not the past: an interior landmark is one "customarily open or accessible to the public or which the public is customarily invited, and which has a special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation" (Administrative Code § 25-302 [m]). It also requires that the site "has been designated as an interior landmark pursuant" to the Landmarks Preservation Law (id.). The use of the present tense and the requirement of a present designation make clear that an interior landmark is one that

presently allows for customary openness.  If the Council intended the definition to describe only a prospective interior landmark, then it would have used the past tense and not referred to a completed designation process.

Even if the plain text did not make clear that public access is an essential characteristic of an interior landmark, it would be a nonsensical interpretation of the statute that would permit a landmarked interior space to be closed off to the public indefinitely.  If an interior landmark is defined, in part, as a site open to the public, it cannot be stripped of that characteristic and still retain its statutory designation.  Otherwise, the definition would be rendered wholly meaningless.  This reading of the Landmarks Preservation Law would allow for the absurd result where a space could be designated an interior landmark one day and shortly thereafter entirely closed off from the public.  What would be the purpose of preserving a space for the public that the public will never enjoy?

The legislative history of the Landmarks Preservation Law also supports the conclusion that public access is a requirement for continued designation.  While the plain language of a statute is "the best evidence of legislative intent, 'the legislative history of an enactment may also be relevant and is not to be ignored'" (Kimmel v State, 29 NY3d 386, 397 [2018], quoting Matter of Tompkins County Support Collection Unit v Chamberlin, 99 NY2d 328, 335 [2003]).  As that history reveals, when the Council was considering whether to amend the Landmarks Preservation Law to protect interior landmarks, the LPC threw its full support behind the amendment, agreeing with the

Council's intended purpose to expand the statutory coverage only to those interiors permanently open to the public. As the LPC's letter to the Council explained:

> "New York City's buildings contain many architecturally notable interiors. Some buildings are actually more distinguished for certain of their great rooms than for their facades. Under the proposed expansion of its powers, the [LPC] will be able, after due notice and public hearing, to provide the same sort of protection to these interior spaces as it now provides to exteriors. The [LPC] agrees that this protection should be limited to interiors that are <u>permanently</u> available for public enjoyment" (LPC, Statement before the New York City Council Committee on Charter and Government Operations, [Nov. 1, 1973] [emphasis added]).

Once passed, the amendment codified the Council's intention to ensure that interior landmarks provided a degree of permanent public access. Accordingly, the only interpretation supported by the Landmarks Preservation Law's plain text and its legislative history is that an interior landmark must be open and available for the public's welfare, enjoyment, and education. When the LPC designated the clock mechanism, it did so with the understanding that the mechanism was and would continue to be available for the public to view. The LPC's own words confirm the error of the current decision to permit privatization of the clocktower without public access and the majority's fundamentally flawed analysis in this regard.

Contrary to the majority's view (majority op at 10), an interior landmark cannot retain its designation if the complete denial of public access is part of the approved alteration. The majority's analysis is based on its erroneous reading of <u>Matter of Teachers Inc. & Annuity Ass. of Am. v City of New York</u> (82 NY2d 35 [1993]) as defining the

public access requirement solely as "a 'jurisdictional predicate' for an initial LPC designation" (majority op at 10).  Teachers required the Court to consider the LPC's authority to  designate the interior of the historic Four Seasons restaurant.[3]  The owner sought to distinguish what it called "'inherently' public interiors, such as railroad stations, lobbies and theaters, which are intrinsically dedicated to public use by their public assemblage purpose," from the restaurant interior, which, although previously open to the public, did not have a "distinctively public purpose" (Teachers, 82 NY2d at 43).  The Court rejected this argument based on the plain language of the statute which made no such distinction.  As the Court explained, "[t]he crux of [the interior landmark definitional provision's public access requirement] is customary openness, accessibility, invitation to the public—words that are readily understood to require usual, ordinary or habitual (rather than rare or occasional) availability to the public" (id.).  The Court similarly rejected the owner's argument that the space fell outside the LPC's designation jurisdiction as a matter of law because it could be adapted for private use.  In so doing, the Court acknowledged the uncontroversial fact "that any structure . . . can be converted to private use in the future; that potential cannot preclude the landmarking of appropriate interiors" (id. at 44).  This statement and the Court's holding merely recognize that the then-extant potential to convert

---

[3] Designated in 1989, the Four Seasons interior is recognized as an uncommon example of International Style architecture (LPC, Designation List 221 at 6, Oct. 3, 1989, http://s-media.nyc.gov/agencies/lpc/lp/1666.pdf).  Constructed in 1958, it was one of the costliest restaurants ever constructed at the time and was completed with rich materials and expert craftmanship (id.).  The restaurant also features numerous works of acclaimed modern art including Pablo Picasso's "The Three-Cornered Hat" (id.).

public space to private space does not foreclose landmark designation because otherwise, no space could ever be landmarked.

Properly understood, and in context, Teachers does not, as the majority contends, conclude that the public access requirement of the Landmarks Preservation Law is only relevant at the initial designation stage.  In fact, the Court in Teachers had no reason to address the question of post-designation public access because the owner's challenge was limited to the LPC's jurisdictional power to designate an interior space in the first instance.

The LPC's decision was also irrational and ultra vires because it permitted Developer to disconnect the clock from its mechanism, resulting in the destruction of an essential characteristic of the clock that warranted its interior landmark designation.  The designation report describes the clock and the mechanism as "a rarity" and the interior components and all fixtures appurtenant to the interior are landmarked because of their "special character, special historical and aesthetic interest and value as part of the development, heritage and cultural characteristics of New York City."  The mechanism's continued operation is part of the clock's unique character as the report explains that "[t]he clock is one of the few remaining in New York which has not been electrified."  The fact that electrification of the clock will not affect the external appearance of the tower is irrelevant.  It is the master design and detail of its interior mechanism and the fact that is not electrified that sets it apart from other clocktowers.

The majority asserts that the LPC's approval of the work was permissible because the Landmarks Preservation Law provides that a certificate of appropriateness may issue

for the "demoli[tion] of any improvement . . . containing an interior landmark" (Administrative Code § 25-307 [a]; majority op at 10). However, the Landmarks Preservation Law cannot reasonably be understood as requiring the approval of both the City Council and mayor for the rescission of an interior landmark's designation, but not for the destruction of the landmark itself. Nor is this point applicable here as Developer did not seek to demolish the clock mechanism. Putting aside whether the LPC could approve work that would demolish the clock mechanism, that is not what LPC ultimately approved.

The LPC's decision to allow Developer to deny public access to the clock and to disconnect the clock mechanism is in direct contravention of the Landmarks Preservation Law's statutory purposes and public policy: the preservation of unique structures and spaces that reflect the City's aesthetic, cultural, and historic values for everyone's enjoyment (Administrative Code § 25-301; Penn Cent. Transp. Co., 438 US at 108). The Law expressly provides that it is intended to "promote the use of [designated landmarks]" (Administrative Code § 25-301 [b] [g]). It authorizes the LPC to issue certificates of appropriateness where "the proposed work would be appropriate for and consistent with the effectuation of the purposes of" the Landmarks Preservation Law and requires the LPC to "consider the effects of the proposed work upon the protection, enhancement, perpetuation and use of the interior architectural features of such interior landmark which cause it to possess a special character or special historical or aesthetic interest or value" (id. § 25-307 [a], [e]). These affirmative obligations require the LPC's express attention

to factors that impact a designated landmark, the public's use of it, and its continued viability as a public cultural asset. The Council mandated conservancy for the benefit of present and future generations. The Landmarks Preservation Law is not, as Developer would have it, for the benefit of those who can pay a high cost for private access. Nor is it intended to facilitate the desires of those who would rather do away with the public's cultural assets because they pose an inconvenience to private interests. The Council's intention is crystal clear: to preserve these spaces "for the education, pleasure and welfare of the people of the city" (id. § 25-301 [b] [g]). We cannot construe the Landmarks Preservation Law in a manner that subverts this legislative intent and the statutory rationale.[4]

Developer's contention that public access would impede the economic viability of landmarks, reduce funds for preservation, and discourage owners from seeking landmark designation reveals its fundamental misunderstanding of the Landmarks Preservation Law. The Council's enactment was in response to the destruction of structures and spaces of historical or aesthetic importance (Penn Cent. Transp. Co., 438 US at 108–109). As the

---

[4] I have no occasion to opine on whether the Appellate Division properly considered statements by the LPC Counsel that the LPC had no authority to require public access because my conclusion that the LPC reached an erroneous decision is based on a pure legal interpretation of the Landmarks Preservation Law and not dependent on whether the LPC adopted counsel's view of the statutory language (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). However, Developer's argument in this regard fails to address well-established law that an agency's decision must be unaffected by an error of law (CPLR 7803). Developer fails to explain how the error discussed by the Appellate Division could be reviewed without reference to counsel's public hearing statements.

United States Supreme Court recognized in <u>Penn Central</u>, New York City's Landmarks Preservation Law, like other urban landmark laws, seeks to "encourage preservation by private owners and users" by ensuring owners "a 'reasonable return' on their investments and maximum latitude to use their parcels for purposes not inconsistent with the preservation goals" (<u>id.</u> at 109–110).  The key is that private use cannot be inconsistent with the public purposes and policy of the Landmarks Preservation Law.  The Council intended to make it economically attractive for the private sector to assist with preservation and enacted legislation that would benefit both the public and private sector.  However, what Developer advocates as a regime in which private development is prioritized over continued preservation is a far cry from the Landmarks Preservation Law's conservancy framework, which puts preservation front and center and fosters private interest in that endeavor with a reasonable return on ownership.  Where, as here, the LPC approves alterations at odds with the preservation of the interior landmark's unique features and the public access requirement that justified designation in the first place, Developer's private use is wholly inconsistent with the goals and public policy of the Landmarks Preservation Law.[5]  The LPC had no authority to permit what the Council forbids.

---

[5] Regardless of the LPC's approval of the renovations to the exterior and other portions of the building's interior, such as the Banking Hall, the Landmarks Preservation Law does not permit the denial of public access to the clock mechanism.  The statute does not suggest that renovations of one designated landmark may justify the rescission of another.  It would be particularly inappropriate here, where it was Developer's commercial interest in commodifying the clocktower, and not the work on the Banking Hall and exterior, that necessitated the alterations to the clock mechanism.  Developer's architect said as much during the hearing when he explained the clock mechanism could be kept open to the public

IV.

Conclusion

Soon after the demolition of Pennsylvania Station had commenced, acclaimed architecture critic Ada Louis Huxtable described the work as an indictment of the City's values. "We want and deserve tin-can architecture in a tin-horn culture. And we will probably be judged not by the monuments we build but by those we have destroyed" (Ada Louis Huxtable, Farewell Penn Station, NY Times Oct. 30, 1963). Fundamentally, the Landmarks Preservation Law, which grew from this fervor, recognized that the structures and sites that embody the spirit of the City should be preserved even when commercial interests seek their destruction. While it might be more profitable to disavow the clatter of the Cyclone, the sight of the Navy Yard dry dock, or the pace of the retractile Carroll Street Bridge, New York City appreciates these elements and the quality they add to public life. The LPC designation here recognized that it was not just the elegant faces of the clock that warranted protection, but also the less visible mechanism that gave it meaning and historical significance. By approving Developer's proposal to irrevocably alter the mechanics that define the unique horological features of the clock and indefinitely deny public access to this interior landmark in violation of the Landmarks Preservation Law, the

---

and that the purpose of electrifying the clock was to allow the clocktower to be sold as part of the triplex.

LPC's decision was erroneous as a matter of law and cannot stand.[6]  I would affirm the

Appellate Division.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order reversed, with costs, and proceeding dismissed.  Opinion by Judge Garcia.  Judges
Stein, Fahey and Feinman concur.  Judge Rivera dissents and votes to affirm in an opinion
in which Judge Wilson concurs.  Chief Judge DiFiore took no part.


Decided March 28, 2019

---

[6]  Although raised in the Appellate Division, there is no takings question presented before
this Court.  In any event, such an argument would be meritless as Developer did not request
a certificate of appropriateness on the ground of insufficient return pursuant to the hardship
provision of the Landmarks Preservation Law (see Administrative Code § 24-309).